ATTORNEY FOR APPELLANT
Jeffrey E. Stratman
Aurora, Indiana

ATTORNEYS FOR APPELLEE
Robert J. Henke
DCS Central Administration
Indianapolis, Indiana

Matthew K. Hagenbush
DCS, Dearborn County Local Office
Lawrenceburg, Indiana

# In the
# Indiana Supreme Court



FILED
Jun 05 2013, 10:41 am

CLERK
of the supreme court,
court of appeals and
tax court

No. 15S01-1306-JT-402

IN RE: THE MATTER OF THE
INVOLUNTARY TERMINATION OF THE
PARENT-CHILD RELATIONSHIP OF:

K.T.K., K.C. and K.R.K. (Minor Children),

and

R.C. (Mother),                                          *Appellants (Respondents below),*

v.

INDIANA DEPARTMENT OF CHILD
SERVICES, DEARBORN COUNTY OFFICE,

*Appellee (Petitioner below).*

Appeal from the Dearborn Circuit Court
Nos.   15C01-1101-JT-001
15C01-1101-JT-002
15C01-1101-JT-003
The Honorable James Humphrey, Judge

On Petition To Transfer from the Indiana Court of Appeals
No. 15A01-1201-JT-14

**June 5, 2013**

**Rucker, Justice.**

Indiana Department of Child Services successfully petitioned to terminate Mother and Father's parental rights regarding their three children, K.T.K., K.R.K., and K.C. The trial court concluded that the Department of Child Services provided clear and convincing evidence that the conditions resulting in the children's continued placement outside of the home would not be remedied and that termination of parental rights was in the best interests of the children. Concluding that the record supports the trial court's findings, we affirm the judgment of the trial court.

**Facts and Procedural History**

R.C. ("Mother") and T.K. ("Father") are the biological parents of three children: K.T.K. born October 21, 2000; K.R.K. born December 5, 2003; and K.C. born April 13, 2009 (collectively the "Children"). The Dearborn County Department of Child Services ("DCS") first became involved with Mother and her Children in August 2009 when Mother tested positive for Oxycodone yet failed to provide a recent prescription for the drug. On September 30, 2009, DCS received a report alleging Mother had passed out in a car with her infant son and required assistance getting in and out of the vehicle two days earlier. When DCS investigated the allegations, Mother denied having any recollection of the event but she admitted to having snorted hydrocodone and xanax that day. On October 2, DCS successfully petitioned to declare all three Children in need of services and removed the Children from Mother's home due to Mother's admitted substance abuse problems and her inability to properly care for the Children. The Children were placed with their biological paternal grandmother ("Grandmother") because Father was incarcerated and thus also lacked the ability to provide or care for his Children.

Mother continued to use drugs and failed to cooperate with the recommended services offered by DCS after the Children were removed from her care. Beginning January 2010, Mother was incarcerated pending charges for theft and receipt of stolen property until mid-July of that year. Two weeks after her release from prison, Mother was arrested again for public intoxication and remained incarcerated until November 4, 2010. By the time mother was released from her second term in prison, the Children had already been under DCS' care for 13 months.

2

On November 12, 2010, DCS changed the permanency plan from reunification to termination of parental rights and adoption. And on January 5, 2011 DCS filed a petition with the trial court for involuntary termination of parental rights. The trial court held an evidentiary hearing on DCS' petition for termination, which lasted three days—June 1, August 9, and September 19, 2011. Throughout this time the Children remained under DCS' care and had been placed in five different living arrangements: (1) October 2, 2009: Children were placed with Grandmother; (2) November 23, 2009: Children were placed with maternal grandfather ("Grandfather"); (3) September 7, 2010: K.C. was removed from Grandfather and returned to Grandmother and K.T.K. and K.R.K. were placed in a foster home with temporary foster family B.E. and K.E.; (4) December 12, 2010: K.C. was also placed with B.E. and K.E.; and (5) February 11, 2011: all three Children were placed with B.S. and D.S. ("Foster Parents") where they have remained since. DCS did not have the option of placing Children with Father because he remained incarcerated throughout the termination hearing.

On October 13, 2011, the trial court issued its Order on Final Termination Hearing ("Order").[1] The order provided in pertinent part:

> 1.  The Children have been placed outside of the home for fifteen (15) of the last twenty-two (22) months.
>
> 2.  There is a reasonable probability that the reasons for placement outside of the home will not be remedied in that:
>     a.  Mother has a severe substance abuse addiction that will always present a risk of relapse, particularly in times of stress.
>
>     b.  Mother's choices have created the circumstances that resulted in the Children's removal from the home and the court found these choices far more compelling than the late remedial efforts made by Mother.
>
>     c.  Mother's lack of commitment in the CHINS process until October 2010 demonstrates her lack of commitment to

---

[1] The trial court later issued an Amended Order on Final Termination Hearing on January 11, 2012 ("Amended Order"). The order was amended to correct errors relating to Father but had no substantive impact on the court's findings of fact or conclusions of law as it relates to Mother. As such, any references to findings of fact or conclusions of law from the trial court's order will be taken from the Amended Order.

her children and shows a reasonable probability that she will fail them again.

d.    Mother has a history of consistent disobedience of the law.

3.    Termination of the parent-child relationship is in the Children's best interests because the Children's need for permanency is paramount.

4.    DCS has a plan for the Children's continued care and treatment, namely to have the Children adopted by their current Foster Parents.

See Amended Order, at 6-7.

On November 4, 2011, Mother filed a timely appeal of the trial court's Order. On February 13, 2012, Father filed an appeal of the Amended Order but Mother did not. In a memorandum decision the Court of Appeals affirmed the trial court's order terminating Father's parental rights. See In re K.T.K., No. 15A01-1201-JT-14 (Ind. Ct. App. Aug. 8. 2012). Due to some procedural missteps by Mother, a divided motions panel dismissed Mother's appeal with prejudice. In re K.T.K., No. 15A01-1201-JT-14, Order Granting Motion to Dismiss (Ind. Ct. App. May 11, 2012). Both Mother and Father petitioned for transfer. We grant Mother's petition and thereby set aside the Court of Appeals order dismissing Mother's appeal. See Ind. Appellate Rule 58(A). In a separate order issued today, we deny Father's petition to transfer. Additional facts are set forth below as necessary.

**Standard of Review**

In considering whether the termination of parental rights is appropriate, "we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and any reasonable inferences therefrom that support the judgment, In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009), and give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand. In re I.A., 934 N.E.2d at 1132 (quoting Ind. Trial Rule 52(A)). Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. Id.; Tr. R. 52(A). In evaluating whether the trial court's decision to terminate

4

parental rights is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." In re I.A., 934 N.E.2d at 1132. "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 148 (Ind. 2005) (quotations omitted).

## Discussion

## I.

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." Id. at 147 (citing Pierce v. Soc'y of Sisters, 268 U.S. 510, 534–35 (1925); Meyer v. Neb., 262 U.S. 390, 399 (1923)). The parent-child relationship is "one of the most valued relationships in our culture." In re I.A., 934 N.E.2d at 1132 (quoting Neal v. Dekalb Cnty. Div. of Family & Children, 796 N.E.2d 280, 285 (Ind. 2003). And a parent's interest in the upbringing of their child is "perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s]." Troxel v. Granville, 530 U.S. 57, 65 (2000). We also recognize, however, that parental interests are not absolute. In re G.Y., 904 N.E.2d at 1259. "[C]hildren have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." In re C.G., 954 N.E.2d 910, 917 (Ind. 2011) (citing Lehman v. Lycoming Cnty. Children's Servs. Agency, 458 U.S. 502, 513 (1982)). Consequently, a parent's interests must be subordinated to the child's interests when considering a State's petition to terminate parental rights. In re G.Y., 904 N.E.2d at 1259. Accordingly, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities" by failing to provide for the child's immediate and long-term needs. In re I.A., 934 N.E.2d at 1132 (alteration in original) (quoting In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied).

Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights for a child in need of services must allege that:

5

(A) one (1) of the following exists:
  (i)   The child has been removed from the parent for at least six (6) months under a dispositional decree;
  (ii)  a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
  (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;

(B) there is a reasonable probability that:
  (i)   the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
  (ii)  the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

I.C. § 31-35-2-4-(b)(2) (2008). DCS must prove the alleged circumstances by clear and convincing evidence. Bester, 839 N.E.2d at 148.


## II.


In this case, DCS alleged (1) "the child[ren] ha[d] been removed from . . . [Mother] and ha[d] been under the supervision of DCS for 15 of the last 22 months or ha[d] been under a dispositional order in the underlying CHINS case for more than . . . six months," App. at 288; (2) "[t]here is a reasonable probability that the conditions that resulted in the child[ren]'s removal will not be remedied and/or the continuation of the parent-child relationship poses a threat to the well-being of the child[ren]," Id.; (3) "termination of the parent-child relationship is in the best interests of the child[ren]" because "the child[ren] need[] a permanent, stable home with sober, capable caregivers who are able to protect [them], supervise [them] adequately, and keep [them] safe from any sort of harm," Id.; and (4) "[t]here is a satisfactory plan for the care and treatment of the child[ren]." Id.

6

Mother first challenges the sufficiency of the evidence supporting the trial court's conclusions with regard to the requirements of Indiana Code section 31-35-2-4(b)(2)(B). We first observe that in order to prove that termination is appropriate, DCS need only prove one of the two grounds alleged in the petition for involuntary termination under section 31-35-2-4(b)(2)(B). Bester, 839 N.E.2d at 148 n.5 ("Having found a reasonable probability that the conditions precipitating the [children's] removal would not be remedied, the trial court was not required to find also that the continuation of the parent-child relationship posed a threat to the [children], since the statute only requires finding one or the other.") (alteration in original)) (quoting In re W.B., 772 N.E.2d 522, 531 n.2 (Ind. Ct. App. 2002); I.C. § 31-35-2-4(b)(2). In this case the trial court determined that both allegations were satisfied.

### A. Remediation of Condition.

In order to terminate Mother's parental rights pursuant to Indiana Code section 31-35-2-4(b)(2)(B)(i), DCS must show by clear and convincing evidence that "the conditions that resulted in the child[ren]'s removal or the reasons for placement outside [Mother's] home . . . will not be remedied." I.C. § 31-35-2-4(b)(2)(B)(i). We engage in a two-step analysis to determine whether the conditions that led to the Children's placement outside the home will not be remedied. First, we must ascertain what conditions led to their placement and retention in foster care. Second, we "determine whether there is a reasonable probability that those conditions will not be remedied." In re I.A., 934 N.E.2d at 1134 (citing In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). In making these decisions, "the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." Bester, 839 N.E.2d at 152 (citing J.K.C. v. Fountain Cnty. Dep't of Pub. Welfare, 470 N.E.2d 88, 92 (Ind. Ct. App. 1984)).

#### i. Conditions Resulting in Children's Removal.

The record shows that DCS removed the Children from Mother's home and placed them in foster care due to Mother's serious substance abuse issues, which rendered her incapable of providing the necessary care and supervision that the Children required. Just days prior to the Children's removal, Mother was seen passed out in a vehicle with her infant son K.C. and

required assistance getting out. Although she claims to have no recollection of the incident, she does admit to having snorted hydrocodone and xanax at that time which contributed to the Children's removal. Through her own admissions and by way of counsel Mother acknowledges that she has a serious substance abuse problem. Mother began taking illegal drugs at the age of 15 and began to abuse beer at the age of 16 or 17. Ex. 1 at 10. At the time DCS removed the Children from Mother's home, she had battled an addiction to prescription drugs for approximately seven years but had abused other illegal substances throughout the Children's lives. See Id. at 7, 10. The evidence of Mother's serious drug addiction is reflected in testimony from various witnesses during the hearing as well as in the Psychological Evaluation and Parenting Assessment from Dr. Edward J. Connor, which was based partly on Dr. Connor's interview with Mother.

DCS Case Manager, Michael Probst, testified that in August 2009 Mother's drug screen tested positive for oxycodone. Tr. at 98. He further stated that Mother later acknowledged having substance abuse issues with prescription drugs and the three drug screens that DCS performed in October 2009 after the Children were removed all tested positive—indicating that she had recently consumed hydrocodone, oxycodone, cocaine, and benzodinine. Id. at 98-99. DCS Family Case Manager, Heather Hardman, testified that Mother's drug screens through November 2009 revealed the presence of morphine and marijuana in addition to the drugs in the aforementioned list. Id. at 34. Moreover, Dr. Connor testified about the contents of his written evaluation of Mother which stated, "[Mother] has tried various illicit substances throughout her young adult years such as hash, LSD, ecstasy, . . . cocaine, crack cocaine, and heroin. She began to use heroin on a regular basis up around the age of 26. The last time she had any heroin was in 2010." Ex. 1 at 10. Mark Clark, a staff therapist for Community Mental Health Center ("CMHC"), testified that Mother was recommended to attend three times the number of sessions for individuals with substance abuse issues than usually required. See Tr. at 242, 245. Most notably, Mother's drug problems were not recent but had lasted through the duration of the Children's lives. This evidence clearly and convincingly supports the trial court's finding that Mother "has a serious substance abuse problem," Am. Order ¶ 2, at 2, which led to the Children's removal from Mother's home.

The record also reflects that Mother has a history of criminal behavior. Her criminal activities resulted in nearly eleven months of incarceration during 2010, which required the Children's continued placement in foster care. In January 2010, Mother was incarcerated pending trial for charges of theft and receiving stolen property. See Ex. 5 at 32-34; Ex. 8 at 60-61. She was eventually released mid-July but then was arrested again in August for public intoxication. She remained incarcerated for those charges until November 4, 2010. In addition, Mother's criminal background includes: operating while intoxicated convictions; Ex. 6 at 41; multiple traffic citations including operating while intoxicated (prior), driving while suspended, and failure to abide by traffic laws; Ex. 1 at 9; Ex. 5 at 37-39; and probation violations that resulted in probation revocation. Ex. 8 at 65-66. Mother's disregard for the law was evident as early as her adolescent years when she was cited for consumption by a minor. See Ex. 1 at 9. Dr. Connor's evaluation revealed that "it is difficult to determine whether [Mother's] criminal mentality has been altered." Id. at 14. He also commented that "her criminal history is concerning and strongly suggests that she is not opposed to violating the law or societal expectations for selfish purposes." Id. This evidence clearly and convincingly supports the trial court's finding that Mother "has a 'criminal mentality' that manifests itself in disregard for the law." Am. Order ¶ 6, at 2 (citing Ex. 1 at 14).

### ii. Reasonable Probability that Conditions Will Not Be Remedied.

Having determined the reasons for which the Children were removed from Mother's care, we now turn our attention to whether there is a reasonable probability that these circumstances will not be remedied. In re I.A., 934 N.E.2d at 1134. In this case, the trial court found that Mother's substance abuse problem is severe such that she will always be at risk for relapse. This finding is supported by the record.

After removing the Children from Mother's home on October 2, 2010, DCS referred Mother to CMHC for a substance assessment, treatment, and monitoring so that CMHC could determine what other services may be needed for her substance abuse problems. Tr. at 31. Mother did not show up for that appointment. Id. Mother also failed to participate in the recommended parenting classes at that time. See Id. at 34, 36-37. Between October 2009 and Mother's incarceration in January 2010, Mother knew that Children were wards of the State and

9

under DCS' care yet she inconsistently participated in DCS' services. Id. During that same time, Mother also failed to cooperate with or return phone calls from *guardian ad litem* ("GAL"), Patty Tyler. Id. at 198-99. When Mother was released from prison in July 2010, she stated to Case Manager, Heather Hardman, that she was willing to complete the available services and "she really wanted to get out and change things." Id. at 33. Notwithstanding, Mother began drinking again two weeks after her release, which led to her second incarceration that year. In light of these actions, Ms. Hardman testified that there is a risk that Mother's behavior would continue; thus, limiting her ability to maintain a successful household for the Children moving forward. Tr. at 39. She explained that "history is a good indicator of the future" and her concerns were based on Mother's "substance abuse history and her criminal activity, [which] would be a good indicator . . . of what would happen and a good indicator for the children as to what could happen as well." Id. at 40.

Dr. Connor's evaluation states "it is difficult to predict with certainty that [Mother] has truly turned her life around." Ex. 1 at 14. He elaborated that Mother's "criminal history . . . strongly suggests that she is not opposed to violating the law or societal expectations for selfish purposes. [And] [i]t is difficult to say with any degree of psychological certainty that [Mother] will continue on her path of sobriety and social responsibility." Id. Dr. Connor further opined that Mother "might not always be able to inhibit her impulses, and the fact that she has lead a pretty risky lifestyle in the past . . . predisposes her to returning to that lifestyle if things become too stressful for her." Tr. at 154. Dr. Gayla Kaibel prepared a written Psychological and Parenting Review on behalf of Mother, which did not contradict Dr. Connor's conclusion in this regard. Rather, Dr. Kaibel testified that Mother's likelihood of re-offending is more based on her ability to remain clean and sober. Id. at 285.

Mother's prior, habitual pattern of substance abuse and criminal conduct resulted in continued neglect of the Children such that "there is a substantial probability of future neglect or deprivation." Bester, 839 N.E.2d at 152 (citing In re J.K.C. 470 N.E.2d at 92). Even Mother's own expert witness, Dr. Kaibel, acknowledged that "the process of getting clean takes some time, more than a few months. [And] [d]iagnostic systems require a full year of sobriety or non-use to assign full remission status." Ex. A-M at 85. It is of no small consequence that evidence presented during the hearing reveals that Mother had not used illegal drugs in approximately 17

months and she had not consumed alcohol in approximately 11 months, resulting in roughly 40 negative drug screens during that time. We are mindful, however, that the trial court was within its discretion to consider that the first eleven months of her sobriety were spent in prison where she would have not had access to any illegal substances, nor be subjected to the type of stressors—namely the responsibility of maintaining a household and raising three young and active children—that would normally trigger a desire to pursue an escape from the pressures of everyday life that drugs often provide. Further, the trial court was within its discretion to "disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts." Am. Order ¶ 3, at 6; see also In re C.M., 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997) (explaining that "it [is] within the province of the trial court, as the finder of fact, to ignore or discredit . . . evidence" of remedial efforts made shortly before the termination hearing). On appeal, "we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d at 1132. Here, the evidence presented clearly and convincing shows a reasonable probability exists that the conditions that led to the Children's removal from Mother's home will not be remedied and we do not find the trial court's findings to be clearly erroneous in this regard.

Having determined that the State met its burden to show that "the conditions that resulted in the child[ren]'s removal or the reasons for placement outside [Mother's] home . . . will not be remedied" pursuant to Indiana Code section 31-35-2-4(b)(2)(B)(i), we need not address whether the State has proven its allegations under section 31-35-2-4(b)(2)(B)(ii). In re W.B., 772 N.E.2d at 531 n.2 (citations omitted).

### B.     *Continuation of Parent-Child Relationship.*

Mother also challenges the trial court's conclusion that termination was in the Children's best interests. As we have said, "[c]lear and convincing evidence need not reveal that the continued custody of the parent[] is wholly inadequate for the child's very survival. Rather, it is sufficient to show . . . that the child's emotional and physical development are threatened by the respondent parent's custody." Bester, 839 N.E.2d at 148 (quotations omitted). "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." In

11

re C.M., 675 N.E.2d at 1139 (citation omitted). When assessing the child's physical, emotional and mental well-being, the trial court may consider a myriad of factors. We acknowledge that among those factors contemplated, "[p]ermanency is a central consideration in determining the [child's] best interests . . . ." In re G.Y., 904 N.E.2d at 1265.

The trial court concluded that termination of Mother's parental rights was in the Children's best interests and expressed the Children's need for permanency as paramount. Am. Order ¶ 4, at 7. Since the Children were adjudicated wards of the State in October 2009, they have been placed in five different living environments over a period of 16 months and in some instances split apart. The Children's home-based therapist, Jack Hopkins, testified that the Children are doing better since being placed in Foster Parents' home. He explained that:

> the children are beginning to sense an attachment with this family in a number of ways, and . . . they are starting to sense a peace and security . . . and maybe a sense of belonging even that they've been lacking, and [they are starting to work through] the uncertainty of where they were going to be placed and what was going to happen with them . . . .

Tr. at 105. He further testified that "one of the things that's been troublesome to the children is that uncertainty of 'where am I going to be, what's going to be my family, [and] what's going to happen to me . . . .'" Id. at 106. This testimony is corroborated by evidence presented by Dr. Connor who testified that the Children were more bonded with Foster Parents than would normally be expected in that short period of time. Dr. Connor also stated the Children's best interests would be served by allowing them to remain in Foster Parents' care. The GAL testified that the risk of reunification is more considerable in this case because of Mother's history and surroundings. As such, she acknowledged that termination of parental rights was in the Children's best interests based on her concerns over the length of time that it took Mother to commit to a path of recovery and "the fact that the children just really need a permanent home." Id. at 199-200. The need for permanency was further echoed by Ms. Hardman. She stated that she supported termination of Mother's parental rights because the Children "need some sort of stable permanency and a drug free environment to grow and develop as normal kids deserve." Id. at 42. She also confirmed that this need for permanency would be satisfied upon termination

of Mother's parental rights because Foster Parents had already expressed a desire and willingness to adopt the Children. Id. at 40-41.

In addition to the Children's need for permanency the record reflects that Mother's habitual pattern of exposing the Children to her criminal behavior detrimentally impacted the Children's psychological, emotional, and physical development. "Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." In re A.C.B., 598 N.E.2d 570, 572 (Ind. Ct. App. 1992). And in this case, not only did Mother's choice of conduct result in a substantial period of incarceration during the Children's young lives, but she deprived them of their youth and innocence by exposing them to her drug usage and—as their primary caretaker—jeopardized their physical safety by neglecting to properly supervise them while she pursued her desire to continue using drugs.

In a letter that ten-year-old K.T.K. wrote to the trial court begging the court to allow the Children to remain with Foster Parents, he recounted instances in which he observed Mother snorting drugs in the bathroom and then he "had to pick the lock and get in there." Ex. 9 at 68. He also wrote that he knew Mother smoked marijuana and felt that Children "were in a [w]hole lot of trouble," id., and it "was a bad life." Id. at 69. K.T.K. claimed that most of the time Mother "didn't even take care of [him]" during the time in which the Children were in Mother's home. Id. K.T.K. also detailed these and other instances of Mother's actions with Dr. Connor. During Dr. Connor's discussions with seven-year-old K.R.K., K.R.K. stated that she did not feel safe with Mother "[b]ecause she drank beer. [K.R.K.] then recalled an incident whereby she fell into a fire pit when she believes that her mother was supposed to be watching her." Ex. 1 at 13. Furthermore, Mother's physical neglect of Children is evident in the report that DCS received, alleging Mother had passed out in a vehicle with her infant son and required assistance getting in and out of the vehicle. It was this very incident that led to DCS' investigation and Children's subsequent removal from Mother's home.

Here, there is ample evidence to support the trial court's finding that the Children's emotional and physical development would be threatened by returning them to Mother's

custody. Therefore, we cannot say that the trial court erred in concluding that termination of Mother's parental rights was in the Children's best interests.

## III.

Finally, Mother argues that the trial court erred by failing to grant Mother's request for a change of judge. The record reflects that on January 20, 2011—during the Fact Finding Hearing—Mother and counsel were "in agreement at th[at] time to withdraw th[e] Motion for Change of Judge and proceed forward . . . on the matter" and thus withdrew the Motion for Change of Judge. Tr. at 19. At that point the trial court accepted Mother's withdrawal of the Motion. Id. Mother cannot now claim that the trial court erred in failing to grant a motion that she voluntarily withdrew.

## Conclusion

We conclude that the evidence supports the trial court's finding that Mother was not able to provide for her Children and termination of Mother's parental rights was in the Children's best interests. We affirm the judgment of the trial court.

Dickson, C.J., and David, Massa and Rush, JJ., concur.