## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 17 2016, 10:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT - MOTHER

Kevin L. Likes
DeKalb County
Deputy Public Defender
Auburn, Indiana

ATTORNEY FOR APPELLANT - FATHER

Stephanie A. Harley
Squiller & Harley
Auburn, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

G.K., S.K., & J.V. (Minor Children)

and

R.V. (Mother) & J.S. (Father),

*Appellants-Respondents,*

v.

June 17, 2016

Court of Appeals Case No. 17A03-1601-JT-150

Appeal from the DeKalb Circuit Court

The Honorable Kirk D. Carpenter, Judge

Trial Court Cause Nos.
17C01-1411-JT-23
17C01-1411-JT-24
17C01-1411-JT-25

The Indiana Department of
Child Services,

*Appellee-Petitioners*

**Baker, Judge.**

R.V. (Mother) and J.S. (Father) appeal the trial court's judgment terminating their parental rights. Given our limited standard of review, we are compelled to find that the trial court's decision is supported by sufficient evidence, and we affirm.

# Facts

Mother is the mother of S.K., born in 2010; G.K, born in 2011; and J.V, born in 2012 (collectively, Children). J.S. (Father) is the father of S.K. The fathers of G.K. and J.V. are both deceased.

On January 13, 2014, the Indiana Department of Child Services (DCS) filed a child in need of services (CHINS) petition regarding Children,[1] alleging that Mother's housing was unstable and that Father had a history of domestic abuse. At a February 18, 2014, hearing, Mother stipulated that the CHINS allegations

---

[1] Our review of this case was significantly hampered by the organization of the DCS's trial exhibits. DCS's appellate brief repeatedly refers to "DCS Ex. 1," but that "exhibit" consists of 247 pages of different motions, orders, requests, and filings. "DCS Ex. 2" similarly consists of 91 pages of assorted documents. Neither exhibit is consecutively paginated, nor are they placed in anything resembling chronological order. There is no table of contents. This lack of formatting makes effective appellate review nearly impossible.

were true, and the Children were adjudicated CHINS the following day. Father also stipulated that the Children were CHINS, and on March 13, 2014, the trial court continued S.K.'s adjudication.

[4] The trial court held separate dispositional hearings for Parents, requiring each parent to participate in DCS services. Both Parents were ordered to complete parenting classes; complete a psychological evaluation; participate in individual counseling; provide suitable, safe, and stable housing; and follow through with other recommendations of DCS.

[5] For her psychological evaluation, Mother went to Dr. David Lombard. Dr. Lombard reported that Mother had high "validity scales," meaning that this scale was "heightened in a way that suggested she was not open and was very defensive in trying to put a very positive face forward." Tr. p. 13. Dr. Lombard testified that Mother's defensiveness invalidated the clinical tests. Despite having invalid test results, Dr. Lombard was able to make some recommendations: cognitive behavioral therapy, dialectical behavior therapy, and a parenting skills training program.

[6] Mother went to another assessment with Dr. Lombard on October 22, 2015. Dr. Lombard testified that her answers were more valid this time. He found that her behaviors were consistent with depression and that "she's easily overwhelmed and would have significant difficulties caring for herself and others." Tr. p. 17. Dr. Lombard also noted his concern that Mother was

unable to relay any knowledge of what she had learned at dialectical behavior therapy.

[7] Mother was also to receive treatment at the Bowen Center (Bowen). Out of fifty-eight scheduled therapy appointments, however, she attended only thirty. Mother's therapist, Kylie Lowry, testified that she "wouldn't be able to say that [Mother has] completed her treatment goals yet." Tr. p. 83.

[8] Bowen also arranged some homebased services to help Mother. Out of eighty-four scheduled appointments, however, she did not show up to eleven, and she cancelled nineteen others.[2] Mother's homebased case manager, Crystal Knights, said that Mother had completed some parenting classes and was in the process of completing others. She noted that Mother had attended classes with more regularity after obtaining a vehicle.

[9] Like Mother, Father was also referred to Dr. Lombard to undergo a psychological assessment. Although he was referred in January 2014, he waited until September 2015 to schedule his assessment. Once again, most of the test results were invalid. Dr. Lombard scheduled another assessment, but again received invalid answers. One test in which the validity scales were not elevated revealed one "significant pathology"—Father "indicated a desire to be at the center of attention and, and have people focus [on] him." Tr. p. 20. In

---

[2] Bowen did not keep records on whether the cancelled appointments were cancelled with twenty-four hours' notice.

response, Dr. Lombard recommended more dialectical behavior therapy and a violence abatement program.

[10] Father was referred to Bowen for services. He failed to attend both scheduled intake appointments, and had not participated in any Bowen services at the time of the termination hearing.

[11] Parents had the opportunity to attend supervised visitation with Children at the Child First Center. Mother attended thirty-nine out of sixty-one scheduled visits.[3] Father attended twenty-eight out of sixty-three scheduled visits. During some of these visits, Parents did not bring snacks. They told the Center that they could not afford snacks.

[12] Parents' visits were suspended in May 2014 due to their inconsistent attendance. When Parents failed to show up to scheduled visits, Children were confused and would cry. Parents agreed to a new system where they would text a confirmation the night before a scheduled visit. This resulted in better attendance for a time, but after two months Parents again became inconsistent—they each missed ten visits after confirming they would attend. Parents' visitation was suspended a second time in April 2015 due to missed visits.

---

[3] Of the twenty-two visits she missed, Mother timely cancelled six, untimely cancelled fifteen, and no-showed to one.

[13] Up to the October 2015 termination hearing, one year and nine months since DCS became involved, Parents had not obtained stable and sufficient housing. Bowen directed Mother to community resources that could have helped her with a down payment for a home, but she did not follow through.

[14] Starting in August 2014, the Children received therapy. Their therapist testified that the termination of parental rights would be in the Children's best interest "[b]ecause [of] the stability and the consistency that [Parents] have not been able to provide in years. I believe there's probably another family out there that can." Tr. p. 70. Children have been in the same foster home since March 2014, and the foster parents are willing to adopt.

[15] The trial court held an evidentiary hearing on the termination petition on October 27 and 29, 2015. On December 21, 2015, the trial court issued its order terminating the parental rights of Mother as to Children and terminating the parental rights of Father as to S.K. Mother and Father separately appeal.

## Discussion and Decision

[16] When reviewing a trial court's decision to terminate parental rights, we do not reweigh the evidence or judge the credibility of the witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and the reasonable inferences drawn therefrom that support the judgment. *Id.* Where a trial court has entered findings of fact and conclusions of law, we consider whether the evidence clearly and convincingly supports the

findings and whether the findings clearly and convincingly support the judgment. *Id.* at 1230.

[17] Our termination statute requires that a petition to terminate a parent's parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> ***
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[18] Ind. Code § 31–35–2–4. DCS bears the burden of proving these allegations by clear and convincing evidence. Ind. Code § 31–37–14–2.

[19] Father argues that the evidence produced at the termination hearing was insufficient to terminate his parental rights as to S.K. Mother essentially argues the same, contending that the trial court abused its discretion because the

evidence did not support the trial court's findings. We will address each argument separately.

# I. Mother's Argument

Mother argues that the trial court's findings were not supported by sufficient evidence. She challenges the following findings: (1) that she has not remedied the conditions that resulted in Children's removal from the home; (2) that there is a reasonable probability that she will not remedy the conditions that resulted in the removal of Children from the home; (3) that her failure to comply with the trial court's order for treatment and obtain housing poses a threat to the well-being of Children; and (4) that termination of her parental rights is in Children's best interest. She points to the several areas in which she has made progress and to the obstacles she faced in attempting to complete the court-ordered training.

Homebased Case Manager Crystal Knights testified that Mother has successfully completed five parenting classes, and at the time of the termination hearing she was in the process of completing others. She had not completed an independent living skills class, but "she's demonstrated progress with . . . finding employment and obtaining her permit." Tr. p. 45. Mother has attended fifty-four home-based services with a Rehabilitation Services Provider where she learned independent living skills. Mother has also attended thirty therapy sessions. Knights testified that Mother would sometimes miss appointments "because her phone would get shut off . . . and it was difficult to reach her," *id.*

at 49, but that recently Mother has made greater efforts to reschedule appointments. At the time of the termination hearing, Mother had independent access to a vehicle and had been employed for five consecutive months. Knights believed that Mother was close to being able to obtain a house.

[22] Family and Child Therapist Nicole Gaunt provided therapy to Children. She testified that G.K. and J.V. were very typical for their age, but that S.K. expressed some aggressive tendencies that were not typical. Gaunt testified that she would only support reinstating visitation if Parents were able to "find stable housing, have a job and keep a job, [and] get transportation so they can get where they need to be." *Id.* at 69. Mother has done the latter two of these three. Gaunt testified that when S.K. "blew up" in anger, Mother responded in the following way: "She tried to engage her. She tried to calm her. She used a very calm voice. She got down on her knees. She was trying to use eye contact. She was asking [S.K.], 'what's wrong? Tell mommy what's wrong.'" *Id.* at 74. Gaunt said that the only thing Mother could have done different would be to leave the room.

[23] Marriage and Family Therapist Kylie Lowry provided five therapy sessions to Mother. They discussed Mother "really missing her kids, being tired due to her work schedule and being really frustrated with not being able to get housing." *Id.* at 79. Mother explained to her that one housing prospect fell through when a previous landlord gave Parents a bad recommendation, but that Mother was looking at different housing options. Mother told Lowry that she did not attend visitation with Children because she lacked reliable transportation. Lowry

opined that Mother has not completed her treatment plan because "she's so overwhelmed with doing things that she needs to do on a daily basis to survive that . . . she's overwhelmed by the thought of having to do extra things." *Id.* at 83. Lowry said she did not believe Parents could provide a safe home for Children because "they don't have a home," but "that's the only thing that's really striking me at this moment." *Id.* at 85.

[24] Family Support Worker Deborah Griebel testified that she supervised thirty-nine visitations. Out of sixty-one scheduled, Mother only "no showed" to one. She testified that Mother acted appropriately, even when S.K. was acting violently toward her. When asked about Parents' parenting skills, Griebel testified, "During visits I observed them to be loving and attentive." *Id.* at 110.

[25] Family Case Manager Nicole Smith began observing the family in January 2014. She explained that Parents "had a very tumultuous relationship." *Id.* at 113. She also explained why Mother missed so many appointments: "[Father] was the means of transportation for [Mother] and so if they were not together she did not have transportation." *Id.* at 113. When Mother was able to attend visitations, she "was very hands on with the Children and she did a very good job of managing their behaviors." *Id.* at 117.

[26] There is no evidence in the record that Mother has used drugs. Nor is there any evidence of Mother being violent. But the trial court found concerning Mother's inability to obtain housing and Mother's missed appointments.

Our Supreme Court has repeatedly instructed us to not reweigh evidence in the context of a termination of parental rights. *K.T.K.*, 989 N.E.2d at 1229. And even though we are to consider whether the evidence clearly and convincingly supports the findings, *id.* at 1230, we are also instructed to "not independently determine whether that heightened standard is met . . . ." *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). Thus, even where the support for the trial court's findings is unclear and not totally convincing, we are compelled to affirm. The trial court's decision meets that minimal standard here.

## II. Father's Argument

Father argues that the trial court erred in finding that the conditions that led to the removal of S.K. were not likely to be remedied. Father points out that many of Dr. Lombard's recommendations were made less than a week before the termination hearing, so he cannot be faulted for not completing the recommendations. He argues the following: "The trial court did not take into consideration that father was employed for at least 4 months continuously and if given additional time, he could have remedied the lack of housing and monetary support for S.K. with the funds from that employment." Father's Br. p. 12.

Father was referred to a psychological evaluation on January 17, 2014. He waited until September 9, 2015, to complete his first psychological evaluation. Because Dr. Lombard could not get good data from his answers, Father had a second evaluation on October 22, 2015—less than a week before the

termination hearing. This delay is entirely attributable to Father, who could have scheduled an evaluation much earlier.

[30] Moreover, Father had the same problem as Mother with regularly attending visitations, and Father never attended the individual therapy offered through DCS. And unlike Mother, there is no evidence of improvement in Father's parenting skills because he has not taken advantage of any of the services offered through DCS. When a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

## Conclusion

[31] The evidence regarding both Parents is completely mixed and ambiguous. It is certainly concerning that Parents have not secured stable housing, and that Parents have not completed all of the services offered through DCS. On the other hand, all of the evidence suggests that Parents act in a loving and caring manner toward Children, and that Mother in particular has made significant progress in becoming a more able parent. Our Supreme Court has instructed us to affirm a trial court's termination decision so long as it is not "clearly erroneous." *See, e.g., In re N.G.*, No. 02S04–1604–JT–207, 2016 WL 1640294, at *2 (Ind. Apr. 26, 2016). That is what we do here.

[32] The judgment of the trial court is affirmed.

May, J., and Brown, J., concur.