# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 15 2018, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James A. Edgar
J. Edgar Law Offices
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:
O.O. (Minor Child),

and

T.G. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

and

August 15, 2018

Court of Appeals Case No.
18A-JT-551

Appeal from the Marion Superior Court

The Honorable Gary K. Chavers, Judge Pro Tem
The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1706-JT-503

Child Advocates, Inc.,

*Guardian ad Litem*

**Baker, Judge.**

[1] T.G. (Mother) appeals the trial court's order terminating her parent-child relationship with O.O. (Child).  Mother argues that the evidence is insufficient to support the termination.  Finding the evidence sufficient, we affirm.

# Facts

[2] Mother has a long history with the Department of Child Services (DCS).  In July 2003, Mother's three children T.C., C.G., and S.G. were found to be children in need of services (CHINS).  In December 2004, all three children were adopted.[1]  In January 2005, Mother's child H.S. was found to be a CHINS based on severe injuries suffered by H.S. with no reasonable explanation.  In August 2006, Mother's child A.S. was found to be a CHINS based on allegations that Mother was unable to provide a safe home environment.  In

---

[1] It is unclear from the record whether Mother's parental rights with respect to these children were terminated voluntarily or involuntarily.

September 2007, Mother's parental rights as to H.S. and A.S. were terminated. In April 2015, Mother's child I.G. was adjudicated a CHINS after Mother made statements about harming him. In March 2017, I.G.'s father was awarded custody of him. Finally, after DCS became involved with Child in this case, Mother had another child, E.G., who was found to be a CHINS in July 2017 after Mother displayed paranoid and combative behavior in the hospital after E.G.'s birth.

[3] Child was born to Mother on March 20, 2016. On April 14, 2016, DCS filed a petition alleging that Child was a CHINS based on Mother's mental health issues that hindered her ability to appropriately parent Child. The trial court removed Child from Mother's care at the initial hearing and ordered Mother to complete psychological and psychiatric evaluations. On September 12, 2016, Child was adjudicated a CHINS after Mother admitted to needing help to address her mental health issues. Following a dispositional hearing, the trial court ordered Mother to participate with home-based therapy and follow all recommendations made by her therapist.

[4] Mother began working with a home-based therapist in May 2017. Upon completion of the intake assessment, the therapist determined that Mother has paranoid personality disorder. Following the intake, Mother attended only one additional appointment, claiming that DCS had falsified all information and denying all allegations as to why Child had been removed. Mother subsequently cancelled two appointments and failed to show at a third; the service was closed as unsuccessful in August 2017. DCS made a new referral

for home-based therapy and, in September 2017, Mother began working with a new therapist. Mother refused to cooperate during the intake appointment, stating that she did not want to work on anything and refusing to open up during sessions. By the time of the termination hearing in February 2018, Mother had attended only three sessions, including the intake, and had not made any progress. The home-based therapist had helped Mother to schedule appointments with a psychiatrist, but Mother missed both scheduled appointments.

[5] Mother's supervised visits initially took place in her home. During visits, Mother was focused on things other than parenting, making frequent statements such as "they was gonna get theirs" in reference to DCS or family case managers and claims that she had contacted President Obama and leaders of other countries to investigate DCS. Tr. Vol. II p. 101-02. In January 2017, the visitation supervisor was removed from the case at Mother's request because the supervisor was not recommending unsupervised visits. From February through June 2017, Mother's visits were supervised at an agency. During visits, Mother frequently needed to be redirected because she was making phone calls without permission or trying to discuss the case with the supervisor. The second supervisor was never able to recommend unsupervised parenting time because of Mother's lack of focus on parenting.

[6] In June or July 2017, Mother was referred to a third agency for supervised visitation. After about a month, Mother started calling to cancel visits at the last minute; frequently, the supervisor had already picked up Child to go to the

visit. Mother's visits were decreased to once a week; when she attended, she frequently needed to be redirected because she would try to have "adult conversations" about the FBI investigating DCS or the judge going to jail. *Id.* at 89. In September 2017, Mother's visits transitioned to a fourth agency. Again, she frequently needed to be redirected after she brought up DCS and made statements that other people and other states were investigating the case and that DCS was engaged in human trafficking. Mother missed four visits in a row and has had no visits since January 2018.

[7] Child has been in the same preadoptive foster home since she was removed on April 18, 2016, when she was twenty-nine days old. Her biological brother also lives in the home. She receives physical, developmental, and speech therapy services, and is bonded to her foster parents and the other siblings in the home.

[8] On June 7, 2017, DCS filed a petition to terminate Mother's parental rights with respect to Child. A factfinding hearing was held on February 13 and 15, 2018, and on March 1, 2018, the trial court entered an order terminating Mother's parental rights. Mother now appeals.

# Discussion and Decision

## I. Standard of Review

[9] Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will

consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

[10] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

    (A)    that one (1) of the following is true:

        (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

        (ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

        (iii)    The child has been removed from the parent and has been under the supervision of a local office or

probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)     The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

Mother argues that there is insufficient evidence supporting the trial court's findings that (1) there is a reasonable probability that the conditions resulting in Child's removal will not be remedied; (2) continuation of the parent-child

relationship poses a risk to Child's well-being; and (3) termination is in Child's best interests.

## II. Conditions Resulting in Removal

[12] Mother first argues that the trial court erred by finding that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied. The reason Child was initially removed from Mother's care and custody was because of concerns about Mother's mental health and the fact that it was not being adequately addressed. Those same concerns, plus Mother's behavior during visits, were the reasons for Child's continued removal throughout the case.[2]

[13] It is undeniable that Mother has significant mental health struggles. Indeed, those struggles are so critical that three of her children have been adopted, her parental rights with respect to two other children have been involuntarily terminated, one child is in the custody of his father, and another child has an open CHINS case. All of Mother's eight children have been involved with DCS. Despite this lengthy history with DCS, and over a decade of involvement with services designed to treat Mother's mental health needs, she has not

---

[2] Mother focuses on an allegation that she had left Child at home with no supervision, arguing that there is no evidence supporting that allegation. Whether or not that was true is of no moment, as concerns about Mother's mental health were the primary reason for Child's initial and continued removal.

successfully addressed the problem to a point that it does not hinder her ability to parent appropriately.

[14] Mother did not participate successfully with either home-based therapist assigned to her case. Her behavior during visits was concerning because she was extremely focused on discussing the case, talking about DCS, judges, doctors, and others being investigated by the FBI, stating that DCS is involved in human trafficking, reporting that she had contacted then-President Obama, etc., rather than focusing on parenting Child. Her visitation supervisors had to redirect her repeatedly during the visits she attended.

[15] Mother emphasizes that while the trial court ordered DCS to provide mental health services tailored to her specific mental health diagnosis, DCS did not do so. Although certainly the better course of action would have been for DCS to make this specific service available, it is well established that a failure to provide services "does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009). DCS provided Mother with three different referrals for mental health treatment during this case; she failed to fully engage or make any meaningful progress with any of those providers. And over the past fifteen years, Mother has been offered many other mental health services—she is simply unwilling to acknowledge that she needs help. As the trial court found, "[m]ental health issues can only be addressed if [Mother] was willing to do so, and she is not. She has steadfastly maintained she does not need therapy." Appealed Order p. 3.

Child was removed, and continued to be removed, from Mother because Mother's mental health issues made her an unsafe parent. Her behavior during visits shows that her mental health issues continued to prevent her ability to safely and appropriately parent Child. Indeed, services providers were never able to recommend that Mother have unsupervised parenting time, let alone reunification with Child. Mother refuses to acknowledge that she needs therapy and has never successfully engaged with a therapist, despite over a decade of opportunity to do so. We find that this evidence supports the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied.[3]

## III. Best Interests

Mother also argues that the trial court erred by finding that termination is in Child's best interests. In considering what is in the best interests of a child, we must consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). In arguing that the trial court's conclusion was erroneous, Mother spends a great deal of time focusing on testimony stating that she was a good person and a good parent. This amounts to a request that we reweigh the evidence and assess witnesses, however, and we decline to do so. *Id.* at 231.

---

[3] Mother also argues that there is insufficient evidence supporting the trial court's conclusion that continuation of the parent-child relationship poses a threat to Child's well-being. As the statute is written in the disjunctive, however, DCS is only required to prove one of the three parts of Indiana Code section 31-35-2-4(b)(2)(B). Therefore, we need not and will not also analyze this element.

[18]	Mother failed to participate meaningfully in the primary court-ordered service in this case—home-based therapy. She refuses to acknowledge that she has mental health needs and refuses to be open to treatment. Her behavior during visits with Child was concerning to a point that not one of her four different visitation supervisors ever recommended unsupervised visitation. Mother has had many years and many chances to accept the treatment she clearly needs, but she is either unable or unwilling to do so. *See Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007) (holding that a "parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children").

[19]	Child has been in the same placement since she was twenty-nine days old. She is bonded to her foster parents and siblings and is placed with her biological brother. Her needs are being met and she is thriving. We find that the evidence supports the trial court's conclusion that termination is in Child's best interests.

[20]	The judgment of the trial court is affirmed.

May, J., and Robb, J., concur.