## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 30 2018, 9:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
M.G. (MOTHER)

Jennifer L. Schrontz
Schrontz Legal Group, LLC
Lafayette, Indiana

ATTORNEY FOR APPELLANT
E.G. (FATHER)

Harold E. Amstutz
Amstutz Law Office
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re:  the Termination of the Parent-Child Relationship of V.G. and C.G. (Minor Children) and M.G. (Mother) and E.G. (Father)

M.G. (Mother) and
E.G. (Father),

*Appellants-Respondents,*

v.

November 30, 2018

Court of Appeals Case No.
18A-JT-1170

Appeal from the Tippecanoe
Superior Court

The Honorable Faith A. Graham,
Judge

Trial Court Cause Nos.
79D03-1710-JT-108
79D03-1710-JT-109

The Indiana Department of
Child Services,

*Appellee-Petitioner*

**Vaidik, Chief Judge.**

# Case Summary

[1]     E.G. ("Father") and M.G. ("Mother") (collectively, "Parents") appeal the termination of their parental rights to their two children.  We affirm.

# Facts and Procedural History

[2]     The undisputed facts are set forth in the trial court's order.[1]  Mother and Father are the parents to V.G., born in June 2003, and C.G., born in December 2005 (collectively, "Children").  In March 2005, DCS opened the first CHINS case involving V.G. because of Parents' substance abuse, lack of supervision, and

---

[1] Because neither Mother nor Father challenge the trial court's findings of fact, we accept them as true.  *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Maldem does not challenge the findings of the trial court, they must be accepted as true.").  While Father states in his brief that the findings of fact are "misleading, inaccurate and incomplete" and "[do] not elaborate on [F]ather's positives," he fails to make any specific argument that the trial court's findings of fact are not supported by the record.  *See* Father's Br. pp. 11-12.

housing instability. V.G. was placed in foster care because Father was incarcerated for possession of cocaine and Mother tested positive for cocaine and was "unable to keep [V.G.] safe." Ex. Vol. I p. 8. The first CHINS proceeding resulted in reunification, and V.G. was returned to Mother. In February 2014, Mother was arrested for failing to appear for a compliance hearing after she was convicted of operating a vehicle while intoxicated and sentenced to probation. Children stayed with relatives (the "T. Family") while Mother was incarcerated because Father was still incarcerated for his 2005 drug offense. After Mother was released, she lived with the T. Family along with V.G. and C.G. However, in May 2014 the T. Family asked Mother and her children to leave because she was "drinking," "not working," and "not helping with the children." *Id.* In July 2015, Parents were involved in a second CHINS proceeding. On July 24, Children were discovered walking along the edge of the top level of a parking garage. Law enforcement could not locate Mother for several hours and Father was incarcerated. DCS investigated and found that Children had been left unattended several times. Mother's new house was messy and there was minimal food. Multiple people were coming in and out of Mother's house, and Children reported that they had been exposed to Mother's sexual activities. DCS removed Children from Mother's house and placed them with the T. Family. Thereafter, the trial court adjudicated Children CHINS and issued a dispositional order requiring Parents to participate in reunification services. Children were ordered to remain in the care and custody of the T. Family.

[3]     After 2015, Mother never had adequate housing for herself or Children. From August 2015 to August 2016, Mother was briefly employed and exercised fully supervised parenting time on a regular basis. During this time, Mother sporadically participated in home-based counseling and case management but was discharged because of her lack of attendance. In 2016, Mother was charged with new substance-related offenses and incarcerated from October 2016 to June 2017. After Mother was released, she did not contact DCS nor did she contact Children. Throughout both CHINS cases, Mother repeatedly tested positive for cocaine and alcohol and refused to submit to drug screens. Meanwhile, Father remained incarcerated until October 2016 when he was transferred to home detention. When Father began home detention he engaged in reunification services and obtained employment and housing. However, in November 2016 Father violated his home detention and was incarcerated until February 2017. After Father was released, he reengaged with services and demonstrated sufficient progress to begin exercising semi-supervised parenting time. Father's sister moved in with him to help provide childcare during his parenting time. In June 2017, Children did a trial home visit with Father, but the visit was abruptly stopped because DCS discovered that Father had recently tested positive for methamphetamine. Children were returned to the T. Family, and Father was incarcerated for failing a drug screen. After Father was released in July 2017, he did not reengage in services nor did he visit Children. Throughout 2017, Father tested positive for opiates, methamphetamine, cocaine, marijuana, and alcohol.

[4] For a time, Children's permanency plan was reunification. However, in October 2017, after the trial home visit with Father failed and because Children had been removed from Parents for over two years, the trial court modified the permanency plan to termination of parental rights followed by adoption. DCS filed petitions for termination of parental rights on October 30 and the trial court held an evidentiary hearing in January 2018. At the time of the evidentiary hearing, Parents were both incarcerated and appeared in custody of law enforcement. Family Case Manager (FCM) Carol Mullens testified that she "did not see . . . progress from [Mother], [and] did see some progress from [Father]" but neither parent was able to maintain stability for a prolonged period. Tr. Vol. II pp. 118-19. Children's therapist, Margarita Lora, testified that the failed trial home visit with Father was "very confusing," "disrupting," and "affected [Children's] stability." *Id.* at 154. Lora said that if Children were returned to Parents, she would be concerned for Children's "stability in terms of housing, in terms of [having] their basic needs covered and emotional stability." *Id.* at 159. FCM Lore Thompson testified that "[Mother] has failed to participate in any way whatsoever in the care or consideration for [Children]." *Id.* at 233. Court Appointed Special Advocate (CASA) Beth Turner testified that "[Mother] can't stay out of jail long enough to do anything with [Children]. [Father] is very selfish, he just cares about himself . . . [Father] would rather be with [his girlfriend] than with [Children] and making sure that [Children] . . . have what they need[.]" *Id.* at 175. Father testified that he did not want his parental rights terminated because "[he] want[s] [Children] to get [to] know who their aunts [are], who their uncles are, who their grandmother

[is], who their grandfather is, at least on [Father's] side of the family[.]" *Id.* at 208. Mother testified that she did not want her parental rights terminated because she does not want "to give [Children] up for adoption[.]" *Id.* at 61.

[5] FCM Mullens testified that the T. Family "have had a bond with [Children] for a very long time . . . very much cared about [Children] and wanted what was best for them." *Id.* at 116. Father testified that Children were safe with the T. Family. *See id.* at 213. Mother testified that "[the T. Family] ha[s] been in our lives for a while now and even though I really don't want to give [Children] to them, I . . . know they're good people[.]" *Id.* at 62. CASA Sue Daluga wrote in her January 2017 report that "[Children] should remain with [the T. Family]. CASA recommends that [Parents] voluntarily terminate their parental rights so [Children] can be adopted by [the T. Family] and finally have some permanency in their lives." Ex. Vol. V p. 39. Therapist Lora, CASA Turner, and FCM Thompson also testified that termination of Parents' parental rights and adoption by the T. Family would be best for Children. *See* Tr. Vol. II pp. 158-59, 174-76, 233-35. In February 2018 the trial court issued its order concluding: that Children had been removed from Parents for at least six months under a dispositional decree; that Children had been removed from Parents under the supervision of DCS for at least fifteen of the most recent twenty-two months; that there was a reasonable probability the conditions resulting in removal of Children from the home of Parents or reasons for placement of Children outside the home of Parents would not be remedied; that continuation of the parent-child relationships posed a threat to the well-being of

Children; that there was a satisfactory plan for the care and treatment of Children—adoption; and that termination was in Children's best interests. The trial court terminated Parents' parental rights.

Father and Mother separately appeal.

# Discussion and Decision

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.,* 51 N.E.3d 1140, 1143 (Ind. 2016).

A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[9] Parents challenge the trial court's determination that termination of their parental rights is in Children's best interests. Specifically, Parents argue that termination of their parental rights is not in Children's best interests because (1) Children's relationships with other relatives may be affected, (2) Children should be able to have contact with Parents, and (3) the trial court should have ordered guardianship or third-party custody with the T. Family instead of termination. *See* Father's Br. pp. 13-14; *see also* Mother's Br. pp. 12-14. To determine what is in the children's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.,* 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied.* In doing so, the trial court must subordinate the interests of the parents to those of the children. *Id.* The trial court need not wait until the

children are irreversibly harmed before terminating the parent-child relationship. *Id.* We have previously held that recommendations by both the DCS case manager and CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is clear and convincing evidence that termination is in the best interests of the children. *Id.* at 1158-59.

[10] Here, Parents do not dispute the trial court's conclusion that the conditions that resulted in removal of Children would not be remedied. Accordingly, Parents have waived any argument relating to this unchallenged conclusion. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007), *trans. denied.* Even so, the trial court's findings of fact support this conclusion. *See, e.g.,* Mother's App. Vol. II p. 32 ("All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal. In fact, the circumstances are worse. Both parents are now incarcerated."). Furthermore, DCS case managers Mullens and Thompson as well as CASAs Turner and Daluga recommended termination. *See* Tr. Vol. II pp. 116-17, 174-76, 233-35; *see also* Ex. Vol. V p. 39. Finally, the trial court found that Children have lived with the T. Family for over two years and that Children are "very bonded with the [T. Family]. The children perform well academically and behaviorally . . . [Children] would like to be adopted by [the T. Family]." Mother's App. Vol. II p. 32. Parents' arguments that termination is not in Children's best interests are requests for us to reweigh the evidence, which we cannot do, *see K.T.K.*, 989 N.E.2d at 1229, or are not supported by the record (e.g., there is no evidence

that another custody arrangement would be in Children's best interest). Accordingly, the trial court did not err when it concluded that termination was in Children's best interests.

[11]   Affirmed.

Riley, J., and Kirsch, J., concur.