## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 21 2017, 10:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
GUARDIAN AD LITEM

Jennifer Balhon
Child Advocates, Inc.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of A.C. and M.C. (Minor Children),

N.C. (Father),

*Appellant-Defendant,*

v.

November 21, 2017

Court of Appeals Case No. 49A02-1705-JT-1147

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Larry E. Bradley, Magistrate

| Indiana Department of Child Services, | Trial Court Cause No. |
| --- | --- |
| *Appellee-Plaintiff.* | 49D09-1607-JT-854 |
| | 49D09-1607-JT-855 |

**Vaidik, Chief Judge.**

# Case Summary

[1] N.C. ("Father") appeals the termination of his parental rights to his two children. Finding no error, we affirm.

# Facts and Procedural History

[2] Father has two children, M.C., who was born in October 2003, and A.C., who was born in January 2011.[1] In March 2015, Father and A.C.'s mother were arrested for shoplifting. A.C. was present at the time of arrest, so the Department of Child Services (DCS) was called to the scene. On March 24, DCS filed a petition alleging that M.C. and A.C. (collectively "the children")

---

[1] M.C. and A.C. have different mothers. M.C.'s mother signed a consent for M.C. to be adopted and, as such, is not a party to this appeal. A.C.'s mother's parental rights were also terminated by the trial court, but she is not a party to this appeal.

were children in need of services (CHINS). The court ordered the children to be placed in the care of their paternal grandmother.

[3] In July 2015, Father stipulated to DCS's claims, and the children were adjudicated CHINS. The court then held a dispositional hearing and ordered Father to participate in and successfully complete a father-engagement program, complete a substance-abuse assessment and follow all treatment recommendations, and submit to random drug and alcohol screenings. Ex. 10. The initial permanency plan was reunification. After the hearing, Father "very aggressively" told DCS that he would not participate in services or take "any drug screens . . . 'cause he hasn't done anything wrong." Tr. Vol. II p. 53.

[4] Father, true to his word, did not partake in any of the services that were ordered. DCS received only one report from father-engagement services, did not receive any reports from the substance-abuse assessor, and received only a few drug-screen results. These results were received because the court ordered Father to submit to drug and alcohol screenings at the courthouse immediately after his status hearings. Father only submitted samples at the courthouse after status hearings and otherwise ignored the court's order that he complete random drug and alcohol screenings. Father took "three or four" screenings at the courthouse. Tr. Vol. II p. 52. On June 23, 2016, the trial court entered a permanency order in which it found, "[Father] continues to struggle with drug

issues. He has never provided a clean screen."[2] Ex. 3. As a result, the court ordered Father "to have three consecutive clean screens" before beginning supervised visitation with the children. Ex. 6.

[5] In January 2016, the children were moved from their grandmother's house to their paternal aunt and uncle's house, which was pre-adoptive. When the children first began living with their aunt and uncle, they were "sad . . . distraught, crying at times" because they did not understand where their parents were. *Id.* at 40. Over the course of these proceedings, the children "gr[ew] up a lot" and became more emotionally stable. *Id.* Both began attending therapy to help with their issues. Specifically, both children were able to address any traumatic memories, process anger and anxiety, and communicate their emotions in a healthy way. Additionally, A.C. was placed on medication to help combat her hyperactivity and stay in class at school. This was "a huge success for her." *Id.* at 41. Six months later in June, DCS petitioned the court to change the permanency plan from reunification to adoption; the trial court granted the request.

[6] Following the change in permanency plan, DCS filed a petition for involuntary termination of Father's parental rights, and an evidentiary hearing was held in April 2017. At the hearing, the children's therapist stated that she was concerned that the children would "regress" if they were removed from their

---

[2] A transcript of this hearing was not provided on appeal. Accordingly, we do not know the specifics of Father's drug use.

aunt and uncle's care. *Id.* at 43. The family case manager, Patsy Newson, also testified that Father never contacted her to request visitation time with his children, which "concerned [her] a lot." *Id.* at 53. She stated that continuation of the parent-child relationship between Father and the children posed a threat to the children's well-being because Father failed to engage with DCS and its service providers. Newson concluded by saying that termination was in the children's best interests and that DCS had a plan for the children to be adopted if Father's rights were terminated. The court-appointed special advocate (CASA) added that M.C., who was thirteen at the time of the hearing, had a desire to remain in contact with Father but wanted to remain living with her aunt and uncle. The CASA agreed with Newson that it was in the children's best interests to be adopted because they needed stability and a sense of permanency. The CASA stated, "[T]here's just such a difference between a year ago and now as far as how, how happy they are." *Id.* at 16.

[7] The court terminated Father's parental rights to the children, concluding that there was a reasonable probability that the conditions that resulted in the removal and continued placement outside of the home would not be remedied by Father. In its order, the court said, "[Father] knew what needed to be done to see his children but has not made an effort to follow through demonstrating he is unwilling or unable to actually be a parent." Appellant's App. Vol. II p. 26. The court further concluded that continuation of the parent-child relationship posed a threat to the children's well-being because it created a "barrier to obtaining permanency for them," that termination was in the

children's best interests, and that DCS's plan for adoption was satisfactory. *Id.* at 27.

[8] Father appeals.

# Discussion and Decision

[9] Father argues that the trial court erred when it terminated his parental rights. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[10] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:

>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

Father contends that the court erred in concluding that there was a reasonable probability that the conditions that led to the removal of his children would not be remedied.[3] He argues that the children were removed because of his shoplifting arrest, but the court terminated his rights because it presumed he

---

[3] Father also argues that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the children's well-being. Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the circumstances listed in subsection (B). *See In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Because we conclude that there is sufficient evidence to support the trial court's conclusion that there is a reasonable probability that the reasons for placement outside the home will not be remedied, we do not address this argument. Father does not challenge the trial court's conclusions that termination is in the children's best interests or that adoption is a satisfactory plan for the care and treatment for the children.

was a drug user despite no evidence at the termination hearing that he had a drug problem. Father claims that the evidence presented at the "short and perfunctory hearing was limited to informing the court that [he] had not completed the drug testing that [DCS] required and [Father] does not dispute this fact." Appellant's Br. p. 8. Father's argument fails for two reasons. First, to the extent that Father asserts that he should not have been subjected to random drug and alcohol screenings because there was no evidence that he abused drugs or alcohol, this argument is untimely. This is a request for us to review the CHINS orders, which were entered in July 2015. A party must file a Notice of Appeal within thirty days after the entry of final judgment. Ind. Appellate Rule 9(A)(1). "Unless the Notice of Appeal is timely filed, the right to appeal shall be forfeited . . . ." App. R. 9(A)(5). Father waited over two years to challenge the CHINS order. Accordingly, this argument is waived. *See Smith v. Marion Cty. Dept. of Pub. Welfare*, 635 N.E.2d 1144, 1148 (Ind. Ct. App. 1994) ("[T]he time for appealing an issue in a CHINS proceeding commences when the dispositional decree is entered."), *trans. denied.*

[12] Second, the relevant subsection of the termination statute—Section 31-35-2-4(b)(2)(B)(i)—is written in the disjunctive, so DCS need only prove either that there is a reasonable probability that the conditions that resulted in the child's removal **or** that the reasons for continued placement outside the home of the parents will not be remedied. Father's argument ignores the second part of this subsection, which DCS proved by clear and convincing evidence. After admitting that the children were CHINS, Father failed to engage in any services

that the court ordered—father engagement, substance-abuse assessment, and random drug and alcohol screenings. Father also "very aggressively" told DCS that he would not be participating in services.[4] Tr. Vol. II p. 53. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[13] Father also had to be ordered by the court to submit to drug and alcohol screenings in the courthouse after status hearings. Father failed all of these screenings. This prompted the court to require Father to have three consecutive clean screens before visitation with his children could begin, but Father never went to additional screenings. Father argues that he did not submit to random screenings because he lived in Morgan County and DCS ordered his screenings to take place at a facility in Marion County. But Father had transportation to get to the screenings, never informed DCS that the location was inconvenient, and never asked for the screening location to be changed. Most importantly, Father never called family case manager Newson to request visitation with his children. "[T]he failure to exercise the right to visit one's children demonstrates a lack of commitment to complete the actions necessary to preserve the parent-

---

[4] Father also contends that DCS refused to refer him to a father-engagement program. The record, however, shows that DCS made the referral and that it remained open for approximately one year. *See* Tr. Vol. II p. 67.

child relationship." *Lang*, 861 N.E.2d at 372 (internal quotations omitted). The trial court correctly concluded that Father "knew what needed to be done to see his children but has not made any effort to follow through demonstrating he is unwilling or unable to actually be a parent." Appellant's App. p. 26. Accordingly, we affirm the trial court's order that there is a reasonable probability that the reasons for placement outside of Father's home will not be remedied.

[14] Affirmed.

Mathias, J., and Crone, J., concur.