## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 12 2017, 10:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.B., and K.B., the Minor Children:

I.B. (Mother) and R.B. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

December 12, 2017

Court of Appeals Case No.
40A01-1702-JT-00429

Appeal from the Jennings Circuit Court

The Honorable Jon W. Webster, Judge

Trial Court Cause Nos.
40C01-1606-JT-31
40C01-1606-JT-32

**Vaidik, Chief Judge.**

# Case Summary

[1] I.B. ("Mother") and R.B. ("Father") appeal the termination of their parental rights to their children, arguing that the evidence is insufficient to support the trial court's decision. We affirm.

# Facts and Procedural History

[2] Mother and Father are the parents of J.B., who was born in March 2011, and K.B., who was born in February 2012. The Indiana Department of Child Services (DCS) became involved with the family in April 2013 after receiving a report that Father had a "temper tantrum" and threw J.B. into his room, the family's house was "filthy," and the children were not clean. Tr. Vol. IV p. 7. The parents agreed to an informal adjustment; however, DCS removed the children in June 2013 when conditions had not improved and the parents tested positive for drugs. The children were placed in foster care.

[3] In July 2013, DCS filed a petition alleging that J.B. and K.B. were children in need of services (CHINS). The parents admitted that the children were CHINS due to "unsafe" home conditions and their positive drug screens. Ex. 8C. Following the dispositional hearing, the court awarded DCS wardship of the children and ordered the parents to, among other things, (1) maintain a safe, clean, stable, drug-free, and violence-free home; (2) submit to random drug and alcohol screens; (3) complete a parenting assessment and successfully complete any recommendations developed as a result of that assessment; (4) complete a

substance-abuse assessment and follow all treatment recommendations; (5) complete a psychological evaluation and successfully complete any recommendations; and (6) attend all visits with the children. The permanency plan at the time was reunification.

[4] When DCS was awarded wardship of the children, they were developmentally behind. According to the foster-care case manager, J.B. was one of the "most anxious" two-year-olds she had ever seen. Tr. Vol. II p. 53. He had a lot of repetitive, obsessive behaviors, such as balling up a piece of lint and holding on to it for more than a day. J.B. was also withdrawn and did not interact with other children. He was almost completely nonverbal, using only three to five words to communicate. He also exhibited negative coping skills, like banging his head against the wall. K.B., who was one-and-a-half years old, was more outgoing than J.B., although K.B. did not talk. K.B. was also more aggressive than J.B., and his head banging was more extreme. K.B. also had night terrors. While in their foster home, both J.B. and K.B. "got developmentally on track." *Id.* at 61. The case manager noted that the children regressed and resorted to negative coping skills after supervised visits with their parents.

[5] In August 2013, the parents completed parenting assessments with Centerstone. Father scored "high risk" in several areas, including lack of nurturing skills and reversing family roles (treating the children as peers). Ex. 4A. Mother scored "high risk" in all areas except one. Ex. 5A.

[6] The following month, the parents completed psychological evaluations with Dr. Jill Christopher. Both parents' IQ scores fell in the below-average range. Dr. Christopher diagnosed Mother with depressive disorder and recommended individual therapy and case-management services for parenting skills. As for Father, Dr. Christopher recommended that he participate in individual therapy for anger, depression, and mood instability and case-management services for, among other things, parenting skills. Dr. Christopher noted that during Mother's and Father's evaluations, they each said that they did not need help with anything.

[7] A periodic case review was held in December 2013. The juvenile court found that the parents were actively participating in all services and had shown improvement. As a result, on February 4, 2014, the children were returned to their parents for a trial home visit. At the beginning of the trial home visit, the parents received intensive in-home services of 22-30 hours per week. Eventually, the service provider's hours were reduced to 5 hours per week to see if the parents could implement what they had been learning. The parents, however, lost any progress they had made and the children lost "about all the gains they [had] made on their developmental catching up." Tr. Vol. IV p. 37. Accordingly, the trial home visit ended on May 13 due to lack of parental supervision, and the children were placed in a new foster home, where they remained at the time of the termination hearing. Upon receiving the children, the foster mother described them as "wild and undisciplined." Ex. 3. For example, she said they walked on furniture and counters. These behaviors

improved, but like before, their behaviors regressed after supervised visits with their parents.

[8] In January 2015, the parents underwent second psychological evaluations with Dr. Tony Sheppard. As for Mother, Dr. Sheppard diagnosed her with bipolar disorder and a personality disorder. He noted that she "has a number of factors that impede her ability to engage with her children. Primary among these is a self-centered approach to life. She will have to be taught how to put her own needs aside in order to provide for her children." Ex. 6. As for Father, Dr. Sheppard found that he "appears to be in denial with regard to the myriad problems that resulted in the removal of his children," which "may explain his inability to make the sustained changes in the home environment and lifestyle that would be necessary for reunification." Ex. 7. Accordingly, Dr. Sheppard found that "[u]nless significant changes occur, there is likely little chance of significant changes in this man's readiness for or openness to change." *Id.*

[9] In October 2015, the permanency plan was changed to adoption, with a concurrent plan of reunification. The following month, Dr. Linda McIntire completed a bonding and attachment assessment at DCS's request. At the time, J.B. was four years old and K.B. was three years old. Dr. McIntire opined that despite the parents' compliance with services, "they have made no progress." Ex. 3. As she observed in her report, "It was astonishing for this evaluator to watch the family in a supervised visitation setting, as they made no effort to control their children's behavior, and little to engage with their children." *Id.* Dr. McIntire noted that Mother and Father "were seemingly far more interested

in playing with some of the toys than they were playing with or parenting the children." *Id.* Dr. McIntire also noted that Mother and Father "demonstrated no ability to manage, or even perhaps understand, their children's behaviors." *Id.* Dr. McIntire acknowledged that the parents had documented cognitive deficiencies; however, she found that these deficits did not "account for the lack of gains in services, or the lack of affective bond and interpersonal interactions with the children." *Id.* Rather, "the most compelling issue" was "the substantial lack of emotional connection between [the parents] and the boys," which was "rooted in problems other than intellectual deficiency, poverty, and/or drug abuse." *Id.* Dr. McIntire recommended that the permanency plan should not be reunification with Mother and Father but rather adoption by the foster parents, with whom the children had "clearly bonded" and refer to as "Mom" and "Dad" "by choice." *Id.* Dr. McIntire noted that the "interaction between the biological parents and the children was remarkably different than that of the children and their foster parents earlier that morning. While the children had some mild behavior difficulties, again as expected, the [foster parents] handled them in a seamless manner." *Id.*

[10] DCS filed a petition to terminate Mother's and Father's parental rights in June 2016. Fact-finding hearings were then held in August and October. Pamela Baugh, the family-support specialist assigned to the family through Centerstone, testified that she supervised visits with the parents and the children from September 2013 until about a month before the termination hearing. The visits were originally 1-2 hours per week and then increased to 8 hours per week.

Baugh said that Mother and Father never had a problem with attendance. Rather, the problem was their low interaction with the children during the visits. Baugh would give the parents suggestions, like Play-Doh or specific crafts, but they never followed through on their own. Baugh also testified that Mother and Father struggled with the nurturing portion of parenting, which was harmful to the children's mental health, and that she did not think that they would ever change. Moreover, Baugh testified that although Mother and Father had made improvements in their life skills through the years, they had made no improvements in their ability to parent from 2013 to 2016. Tr. Vol. II p. 109.

[11] In addition, DCS Family Case Manager Michelle Shepherd testified that the parents' attendance at visits was "phenomenal," Father had not had a positive drug screen since July 2015, and Mother and Father had "greatly increased their personal daily living skills." Tr. Vol. IV pp. 12, 13. However, "[a]s far as their ability to parent their children," Family Case Manager Shepherd said it was "the same" "now" as the "very first" visit. *Id.* at 13. She gave the following example:

> [K.B.], the younger guy, kept getting closer to the fan, kept
> wanting to play with the fan. The fan was on. The hair on the
> back of my head was standing up and [Mother's] just trying to
> push him away from it, and [the visit supervisor] whispers to me
> that he had told [Mother] every visit before to unplug the fan and
> put it up out of reach. Every visit before was at least 12 prior
> visits that they had had, and still he had to remind [Mother] that
> this is not good and the verbal didn't work, so he had to go over
> and stand by [Mother], turn off the fan, and say, [K.B.] we don't

play with this. This is 3 years into this case, 3 years of visit supervision and something as simple as a 4 year old playing with a fan is [it] life threatening, not necessarily[,] is it dangerous? Yeah.

*Id.* at 15. Accordingly, Family Case Manager Shepherd found that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of J.B. and K.B.:

> The lack of interaction that I have personally witnesse[d], that Dr. McInt[i]re has witnessed, that every visit supervisor has witnessed, is emotional abuse, I mean just to put it at very bare bones. These children will not learn how to act with other people, if they don't learn it at school, and that's assuming that they get to school on time, don't miss the bus and everything like that, they don't get a chance to practice it at home. And if you don't practice those social skills at home you don't have them. [If] they can't keep . . . [K.B.] safe from a fan, how do we expect [them] to keep them safe from anything else? They can't keep [K.B.] from running across the street, running away from them because when mom says stop, he doesn't stop. That's not [K.B.] being indirect, if I did it, I've stopped him before . . . . Everyone in that household except for mom and dad are looked upon as an authority figure. Mom and dad are not, mom and dad will never be seen a[s] authority figures, they cannot do that which they need to do in order to be that authority.

*Id.* at 27.

[12] The juvenile court issued an order terminating Mother's and Father's parental rights in January 2017. Mother and Father jointly appealed that order. The State filed a motion for remand arguing that the juvenile court's termination order was deficient because it did not include the required statutory findings.

We ordered the juvenile court to issue an amended termination order. *See In re I.B.*, Case No. 40A01-1702-JT-429 (Ind. Ct. App. Aug. 31, 2017). The juvenile court issued an amended termination order on September 11, 2017, finding that there was a reasonable probability that continuation of the parent-child relationship posed a threat to the well-being of J.B. and K.B., that termination was in the best interests of the children, and that there was a satisfactory plan for the care and treatment of the children, namely, adoption. The parties then filed amended briefs based on this order.

## Discussion and Decision

[13] Mother and Father contend that there is insufficient evidence to support the termination of their parental rights to J.B. and K.B. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence clearly and convincingly supports the trial court's findings and whether the findings clearly and convincingly support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[14] A petition to terminate parental rights must allege, among other things:

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Mother and Father "concede" that termination is in the bests interests of J.B. and K.B. and that there is a satisfactory plan for their care and treatment. Amended Appellants' Br. p. 19. However, they argue that there is insufficient evidence to support the juvenile court's conclusion that continuation of the parent-child relationship poses a threat to J.B.'s and K.B.'s well-being.[1]

---

[1] Mother and Father also argue that there is not a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside the home of the parents will not be remedied. However, the juvenile court did not reach such a conclusion in this case. Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the

[15] Mother and Father argue that the juvenile court relied on "outdated reports and evidence" in terminating their parental rights.[2] *Id.* at 20. They emphasize that DCS "submitted parenting assessments from August, 2013, psychological reports from September, 2013, psychological reports from January, 2015, and a parent-child assessment from November, 2015." *Id.* at 20-21. However, they note that the fact-finding hearings were held in August and October 2016, which "makes these reports from nine months to three years old at the time of the hearings." *Id.* at 21. Mother and Father assert that testimony from the "most recent service providers show[s] evidence of changed conditions that [is] inconsistent with" the older evidence. *Id.* They direct us to testimony from Patty Ruddick and Jessie Lang.

[16] We reject Mother and Father's argument for several reasons. First, we do not believe that these reports are "outdated." At the very least, they show the timeline in this case and the parents' progression. Second, the parents' argument strikes us as an attack on the weight of the evidence, not its admissibility, and we do not reweigh evidence. *See K.T.K.*, 989 N.E.2d at 1229.

---

circumstances listed in subsection (B). *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Although the juvenile court referenced (b)(2)(B)(i) early in its order, *see* Amended Appellants' App. p. 70, it later found that only (b)(2)(B)(ii) had been satisfied. *See id.* at 75. Accordingly, we do not address (b)(2)(B)(i) in our decision.

[2] Mother and Father also note that they both suffer from an intellectual disability and point out that mental disability, "standing alone, is not a proper ground for terminating parental rights." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992). However, there is no evidence here that the parents' mental disability alone was the reason for terminating their parental rights to J.B. and K.B. *See id.* ("Where, however, the parents are incapable of or unwilling to fulfill their legal obligations in caring for their children, then mental illness may be considered.").

Third, even without the reports, there is plenty of evidence in the record to support the juvenile court's conclusion that continuation of the parent-child relationship poses a threat to the children's well-being. For example, Baugh, who supervised visits from September 2013 until about a month before the termination hearing, testified that although Mother and Father had made improvements in their life skills through the years, they had made no improvements in their ability to parent from 2013 to 2016. In addition, Family Case Manager Shepherd testified that although Mother and Father had improved in some areas, their ability to parent had not improved from the first visit to the last. And both testified that Mother's and Father's parenting was harming the children's mental health. Fourth, the witnesses Mother and Father direct us to, Ruddick and Lang, worked primarily with the parents on life skills, not parenting skills. Accordingly, we find that there is sufficient evidence to support the juvenile court's conclusion that continuation of the parent-child relationship poses a threat to J.B.'s and K.B.'s well-being. We therefore affirm the termination of Mother's and Father's parental rights.

[17] Affirmed.

Mathias, J., and Crone, J., concur.