## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 15 2018, 9:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT R.L.J., FATHER

Carlos I. Carrillo
Greenwood, Indiana

ATTORNEY FOR APPELLANT R.A.T., MOTHER

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationships of: Ne.T., Na.T., Ni.T., No.T. (Minor Children),

R.L.J. (Father)

and

R.A.T. (Mother),

*Appellants-Respondents,*

v.

March 15, 2018

Court of Appeals Case No. 79A04-1710-JT-2391

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause Nos.
79D03-1702-JT-17
79D03-1702-JT-18
79D03-1702-JT-19
79D03-1702-JT-20

The Indiana Department of
Child Services,

*Appellee-Petitioner*

**Baker, Judge.**

[1] R.L.J. (Father) and R.A.T. (Mother) appeal the trial court's order terminating their relationship with their children, arguing that the evidence is insufficient to support the order. Finding the evidence sufficient, we affirm.

# Facts

[2] Father and Mother are the parents of three children: Ne.T., born in September 2007, Na.T., born in February 2011, and Ni.T., born in June 2012. The fourth child, No.T., born in January 2015, has a different father, D.M., who voluntarily terminated his parental rights and does not participate in this appeal.

[3] On November 5, 2015, the Department of Child Services (DCS) filed a petition alleging that the children were children in need of services (CHINS). At that time, the children lived in a home with Mother, maternal grandmother, maternal step-grandfather, and Mother's then-boyfriend, T.N. (Stepfather). After receiving allegations that the children were being exposed to drug use, DCS performed a hair follicle test on all the children and requested that all adults in the home also submit to a drug test. Ni., age three, and No., age one,

tested positive for cocaine and amphetamines. Ne. and Mother were negative for all substances and Na.'s hair was too short to test. Maternal grandmother was positive for cocaine and amphetamines and Stepfather and step-grandfather refused to be tested. DCS removed the children and placed them in foster care. Mother married Stepfather, whom she had known for one month, the next day.

[4] In the weeks leading to the CHINS factfinding, Mother tested positive for amphetamines and methadone; she later admitted to taking Adderall and methadone without a prescription. On March 2, 2016, the trial court found all the children to be CHINS. With respect to Father, the trial court found that he had not established paternity for any of the children, had only recently obtained employment and housing, and did not have beds or childcare in place for the children. At the dispositional hearing, the trial court ordered the parents to participate in the following services:

- Both parents were required to obtain and maintain safe and suitable housing and a stable and sufficient source of income.
- Both parents were ordered to participate in parenting time.
- Both parents were required to refrain from use of alcohol, illegal drugs, or prescription drugs with no prescription. They were also required to submit to random drug screens.
- Both parents were ordered to participate with home-based case management and comply with any recommendations.
- Both parents were ordered to complete a substance abuse assessment and comply with any recommendations.
- Both parents were ordered to establish paternity.
- Mother was ordered to complete a mental health assessment and comply with any recommendations.

### *Mother*

[5] Mother's participation with home-based case management was sporadic throughout the case. The purpose of that service was to assist Mother with basic needs, including housing searches, budgeting, employment, transportation, drug education, parenting education and skills, scheduling skills, and coping skills. Mother was discharged from this service at least three times and did not successfully meet any of the goals. She continued to be unable to maintain a consistent schedule, which was concerning because three of her children had high educational needs and needed to attend school and speech services regularly.

[6] Mother completed a mental health assessment in January 2016. The assessment recommended that Mother attend therapy to develop healthy coping mechanisms, manage her depression, process her past abusive relationships, and learn about healthy relationships. The assessment also recommended she work to obtain appropriate housing and address parenting issues.

[7] In March 2016, Mother completed a substance abuse assessment. She admitted to illegal drug use and non-prescription drug abuse within the last twelve months. Mother was very defensive about substance use topics, which indicated she would be highly resistant to treatment. The assessment recommended bi-weekly therapy to work on controlling stress, addressing her depression, learning healthy coping mechanisms, processing her past abusive relationships, and addressing parenting issues.

[8] Based on the recommendation of the mental health and substance abuse assessments, in March 2016, Mother began attending therapy. She missed more than half of the appointments, and the therapist discharged Mother from the service in July 2016. She was re-referred to therapy at some point in early 2017, but was discharged unsuccessfully in April 2017 for failure to make contact. Mother stated that she intentionally stopped participating with therapy because she did not feel that she needed that service to learn coping skills. She admitted that she was depressed and that this condition made it difficult to complete services.

[9] Mother participated inconsistently with random drug screens, missing twenty-five screens between August 2016 and June 2017. She also tested positive for various substances throughout the case, including amphetamines, phentermine, synthetic cannabinoids, opiates, morphine, and marijuana. The screen she provided between two days of the termination hearing was positive for opiates and morphine. She was four months pregnant at that time.

[10] Mother attended visits inconsistently. She was unsuccessfully discharged from visits in July 2016 because she had missed so many sessions. She was re-referred to a new agency and progressed to having in-home visits. The visits returned to an agency, however, when Stepfather texted the Family Case Manager (FCM) and told her he would no longer allow any service providers or visits in the home. Mother moved out of that home so that she could continue to participate in home-based services, but made it clear that she would move back in with Stepfather after services had ended. In early 2017, Mother

requested that DCS re-screen her mother and stepfather, presumably so that she could move back in or have her visits there. Maternal grandmother tested positive for amphetamines, cocaine, and methadone; maternal step-grandfather tested positive for cocaine, norcocaine, codeine, morphine, and a heroin metabolite.

[11] Mother had a history of unstable housing. At the time the CHINS case was opened, she was living with her mother and stepfather. Then, Mother, Stepfather, and his grandmother lived in the grandmother's home. Then, when Stepfather refused to allow service providers in the home, Mother lived with an aunt. On the first day of the termination hearing, Mother said she lived with her aunt but that her home was Stepfather's grandmother's home. She had never had independent housing and always lived with relatives.

[12] Mother married Stepfather the day after the children were removed, one month after she had met him. DCS was concerned about Stepfather because he refused to screen at the time of removal and because he had very little involvement with his own children (who have, themselves, been involved with DCS) and would need help developing parenting skills.

[13] Stepfather tested positive for synthetic cannabinoids in February and November 2016. He participated in visits until January 2017, when he sent a threatening note to the FCM. After that time, Stepfather stopped visiting or participating.

[14] Stepfather completed a parenting assessment in the spring of 2016, which recommended he attend parenting classes and participate with individual

therapy to address anger management. Stepfather participated with services sporadically, expressing a lack of understanding of why he had to participate with services and opining that all the social workers and service providers wanted was government money. He believed that DCS kidnapped children to sell them into sex slavery and that DCS was permitted by law to lie in court, tamper with evidence, and plant evidence. He was consistently hostile and threatening to the FCM and other service providers.

### Father

[15] Father completed a mental health assessment in December 2016. The assessment recommended individual therapy and a substance abuse assessment, among other things.

[16] Father had already been referred for individual therapy in early 2016. In April 2016, he was unsuccessfully discharged for failing to attend. He was twice more re-referred, again failed to attend consistently, and was again unsuccessfully discharged.

[17] Father participated sporadically with home-based case management. In February 2016, the case manager noted Father's home was dirty, cluttered, and garbage-ridden. He was unsuccessfully discharged in March 2016 for lack of consistent participation. He was re-referred for this service at some point and continued to participate sporadically throughout the case. Father also participated inconsistently with home-based therapy, and he was ultimately unsuccessfully discharged for lack of consistent attendance.

[18]     In March 2016, Father completed a substance abuse assessment. The assessor diagnosed him with unspecified drug abuse, inhalant abuse, and major depressive affect disorder. The assessment recommended individual therapy and case management. As noted above, Father did not successfully participate with those services. After testing positive four times for synthetic marijuana, Father completed another substance abuse assessment in December 2016. The assessor diagnosed Father with synthetic cannabis use disorder and recommended that he participate in individual counseling, case management, and random drug screens.

[19]     Father tested positive for synthetic cannabinoids in March, July, and November 2016 and in January 2017. He frequently failed to attend his random screens, amassing twenty no-shows for screens at his home between July and October 2016.

[20]     In July 2016, Father loaned his ATM card to friends, who withdrew large sums of money and purchased alcohol. The FCM was concerned and went to Father's home, where she found alcohol in the home and a green leafy substance on the dining table. Although that substance was never tested, Father tested positive for synthetic marijuana that same day.

[21]     Around that time, Father texted his home-based case manager, who also supervised his visits, and told her that he would attend no more visits and to leave him alone. For months thereafter, he refused to respond to the case

manager or schedule more visits. At some point, that service was again re-referred and he began working with a new case manager.

[22] The home-based case manager who was working with Father in January 2017 noted that he struggled with communication skills, understanding, and hygiene. On February 6, 2017, the case manager arrived at his home for an appointment but Father did not answer the door. They spoke on the phone and Father's speech was slow, slurred, and incoherent. The next day, Father attended an appointment with the case manager at which he was disorganized and unfocused. He also attended a visit to which he was a half hour late and appeared under the influence. He was unsuccessfully discharged the following week.

[23] With respect to visits, Father was initially consistent, though he struggled with hygiene, frequently became frustrated with Ne., and spoke poorly about Mother in front of the children. He stopped visiting the children after his positive drug screen in July 2016. Visits were re-referred in January 2017, but he was discharged for failing to schedule them. Service providers determined that the visits were having a negative emotional impact on the children, so the visits were never again re-referred. He has not seen his children since July 2016.

[24] Father's housing was unstable throughout the proceedings. When the children were removed in November 2015, he was living with his sister. As of December 2015, he had his own home, but left that place in August 2016—either his lease had expired or he was evicted. He found another apartment for

three months but decided it was not safe, so he moved out. He then stayed with various friends. At the time of the termination hearing, he had lived at a new place for about six weeks with a friend; Father was not on the lease.

### *Termination Proceedings*

On February 14, 2017, DCS filed a petition to terminate the parent-child relationship between Mother, Father, and the children. The termination hearing took place on April 20, June 9, and June 14, 2017.

At the time of the termination hearing, Father had not established paternity[1] or obtained a driver's license. He provided testimony on June 9 and was to be cross-examined on June 14, but he failed to appear in court on June 14. Father testified he felt that he had completed all required services, that DCS was merely finding reasons to prolong the case, and that he should have custody of his children.

Mother testified that she did not believe her mother used cocaine even though she tested positive for that substance twice during the proceedings. Mother believed her mother's home would be safe for the children because her step-grandfather had moved out. She stated neither case management nor therapy was helpful, which is why she stopped attending. She denied the accuracy of her drug screen that was positive for morphine. She and Stepfather were

---

[1] He completed a DNA test that revealed he is the biological father of the three children, but never opened a paternity case to establish legal paternity.

expecting their first baby together in about five months, but she had not yet been to the doctor.

[28] Stepfather denied that there was drug use in maternal grandmother's home or that he had used illegal substances. He claimed all urine samples throughout the case, including his own and the children's, had been tampered with. He testified that DCS is a kidnapping ring for the government and that he did not believe Mother needed any services.

[29] On September 17, 2017, the trial court issued its order granting the petition to terminate the parent-child relationship between Mother, Father, and the children. The parents now appeal.

# Discussion and Decision

## I. Standard of Review

[30] Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly

supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

[31] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

[32]    Both parents argue that there is insufficient evidence supporting the trial court's findings that (1) there is a reasonable probability that the conditions resulting in the children's removal will not be remedied; (2) the continuation of the parent-child relationship poses a threat to the children's well-being; and (3) termination is in the children's best interests.

# II.  Mother

## A.  Conditions Resulting in Removal

[33]    The children were initially removed from Mother's care and custody because of drug use in the home.  They continue to be removed because of drug use concerns, Mother's mental health, and general concerns about her parenting skills.

[34]    With respect to drug use, Mother missed many screens and was positive for many others.  Indeed, between the first and second days of the termination hearing, a period of seven weeks, Mother missed six screens and tested positive for morphine.  She refused to admit that she had a substance abuse issue and refused to participate with therapy to address the problem.  Stepfather has also tested positive for illicit substances during this case and has showed no willingness to participate with any services to address the issue.

[35]    With respect to her mental health, Mother has depression, which she admits, but stopped attending therapy even though she admitted she could benefit from it.  With respect to her parenting skills, Mother refused to participate with services designed to help her improve in that area.  She failed to protect her children from her mother's drug use and even at the termination hearing, refused to acknowledge the veracity of the drug tests showing that her mother had used cocaine.

[36] We find that this evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the children's initial and continued removal from Mother's care and custody will not be remedied.

## B. Continuation of Parent-Child Relationship

[37] Next, Mother argues that the trial court erred by concluding that the continuation of the parent-child relationship poses a threat to the children's well-being.

[38] The CHINS case opened because two of the children tested positive for cocaine and amphetamines. While Mother's screen was clean on that day, she had failed to protect them from serious drug use in the home. She has never seriously dealt with her own substance abuse issues. She has never seriously dealt with her own mental health issues. She has never seriously worked on learning how to manage the schedules of herself and four children, including ensuring that they go to school on a regular basis.

[39] She married Stepfather after knowing him for only one month. He has been hostile and threatening to DCS and service providers throughout this case and believes that DCS is a kidnapping ring that sells children into sex slavery. He has never consistently participated with services. While Mother moved out so that her services could continue, she planned to move back in with Stepfather as soon as services had ended. Both Mother and Stepfather claim that the drug test results are false and refuse to accept any responsibility for the situation.

[40] The continuation of the parent-child relationship poses a threat to the children's well-being when the evidence shows that the adults are engaging in ongoing destructive and dangerous behavior without any real signs of improvement. *In re A.I.*, 825 N.E.2d 798, 807-08 (Ind. Ct. App. 2005) (finding such evidence where parents blamed others, externalized responsibility, attended services infrequently, and were generally uncooperative). We find that the evidence in this case supports just such a conclusion with respect to Mother. In other words, the evidence supports the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the children's well-being.

## C. Best Interests

[41] Finally, Mother contends that the trial court erred by finding that termination is in the children's best interests. In addition to the evidence already discussed above, which we will not reiterate, we note that Mother was inconsistent with her visits with the children, had a history of unstable housing, failed to successfully complete a single service, and tested positive for morphine at the time of the termination hearing.

[42] The Court Appointed Special Advocate (CASA) and the FCM testified that they believed termination was in the children's best interests. The CASA noted that she believed Mother loved the children but was living in an inappropriate home with Stepfather, who had not participated in services, and was unable to provide the children with a stable, drug-free home. The FCM testified that Mother refused to accept responsibility for her actions, lacked the skills to get

the children to school and meet their needs, and was unable to sustain any small amount of progress she had made. Indeed, in the FCM's opinion, Mother may have regressed overall while the case was open. Both the CASA and the FCM had grave concerns about Stepfather, who would live with the children if they were placed with Mother. He refused to participate with services, expressed significant hostility, had voluntarily terminated his rights to one of his children and had little contact with his others, and had stopped spending time with the children in this case months before the termination hearing.

[43] Under these circumstances, we find sufficient evidence supporting the trial court's conclusion that termination is in the children's best interests.

# III. Father

## A. Conditions Resulting in Removal

[44] The children were initially removed because of drug use in Mother's home. They were not placed with Father at that time because he did not have suitable, stable housing for them. They continue to be removed from Father because of concerns about his substance abuse issues, parenting and life skills, and unstable housing.

[45] Father lacked suitable and stable housing and a driver's license when the case opened, and still lacked both as of the second day of the termination trial. He moved frequently throughout the case, often living with friends for brief periods of time without being on the lease. He was unable to maintain a home that was

clean, uncluttered, and garbage-free. He failed to complete any services successfully. He tested positive for illicit substances more than once, missed many random drug screens, and has never completed the therapy recommended by his two substance abuse assessments. He halted visits with his children for months after he tested positive for synthetic cannabinoids; once visitation had been re-referred it was discharged because he failed to set up the visits. He had still not established paternity at the time of the termination hearing.

[46] We find this evidence sufficient to support the trial court's conclusion that there is a reasonable probability that the conditions leading to the children's initial and continued removal from Father's care and custody will not be remedied.

## B. Continuation of Parent-Child Relationship

[47] Father next argues that the trial court erred by concluding that the continuation of the parent-child relationship poses a threat to the children's well-being. As noted above, Father has been unable to maintain stable, suitable, appropriate housing. He has not participated in parenting education or other services to improve his parenting skills, nor has he addressed his mental health issues. His visits (or the inconsistency thereof) became so harmful to the children that providers determined it was not in their emotional best interests to continue with the visits. Father tested positive for illegal substances multiple times during this case but he has never addressed his substance abuse issues. During the case, he had periods of unemployment interspersed with jobs requiring

overnight hours and/or long hours. He had no plans for childcare, getting the children to and from school, or suitable housing, should the children be placed with him.

[48] We find that this evidence supports the trial court's conclusion that continuation of the parent-child relationship poses a threat to the children's well-being.

## C. Best Interests

[49] Finally, Father argues that the trial court erred by finding that termination is in the children's best interests. As noted above, despite many opportunities, Father has failed to sufficiently address any of his underlying issues. His presence in the children's lives at visits—and/or his extremely inconsistent attendance at those visits—was actively causing them emotional harm.

[50] The CASA believed that termination is in the children's best interests because Father had been discharged from all services and did not have stable housing. The FCM also believed that termination is in the children's best interests because of Father's drug use and history of unstable housing. At the time of the termination hearing, the FCM believed that Father was barely able to take care of himself, much less three young children. By the time of the second day of the hearing in June 2017, he had not even seen his children for nearly a year— since July 2016, when the visits stopped at his request.

[51] We have no doubt that Father loves his children, and the record supports his argument that they are bonded to him. But the record likewise supports a

conclusion that he is unable to provide a stable, appropriate, drug-free home for his children or to meet their other needs. Under these circumstances, we find that the evidence supports the trial court's conclusion that termination of the parent-child relationship between Father and his children is in the children's best interests.[2]

[52] The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.

---

[2] Father takes issue with many of the trial court's findings of fact. Each of these findings, however, has evidence supporting it. Father directs our attention to other evidence undercutting these findings, but this is merely a request that we reweigh the evidence, which we may not do.