# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 04 2018, 9:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Mark K. Leeman
Leeman Law Office and
Cass County Public Defender
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of V.G. (Minor Child), <br><br> A.G. (Mother) and R.L. (Father), <br><br> *Appellants-Respondents,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner* | April 4, 2018 <br><br> Court of Appeals Case No. 09A05-1711-JT-2573 <br><br> Appeal from the Cass Circuit Court <br><br> The Honorable Leo T. Burns, Judge <br><br> Trial Court Cause No. 09C01-1703-JT-5 |

**Baker, Judge.**

[1] A.G. (Mother) and R.L. (Father) (collectively, the Parents) appeal the trial court's order terminating their parent-child relationship with their child, V.G. (Child). The Parents argue that there is insufficient evidence supporting the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being. Finding the evidence sufficient, we affirm.

## Facts

[2] Child was born on June 9, 2016. In the days following Child's birth, the Department of Child Services (DCS) received multiple allegations that Child was unsafe because of domestic violence and physical abuse.

[3] On June 21, 2016, the police were called to the Parents' home because of a domestic dispute. Officer Daniel Fagan noted that he had been dispatched to deal with the Parents' domestic disputes approximately fifteen times since January 2016. On this day, Mother was arrested for hitting Father and charged with Level 6 felony domestic battery. As a result of this charge, a no contact order was put in place preventing Mother from having contact with Father and Child. At that time, DCS did not have concerns about Child's safety, so Child remained placed with Father.

[4] On July 5, 2016, DCS received a new report alleging that Mother had violated the no contact order. When law enforcement and DCS arrived at Parents' home, Mother and some family friends were inside with Child. Father was outside walking across the parking lot. Father stated that he was unable to care

for Child and made some comments about harming himself. Mother was arrested and charged with Class A misdemeanor invasion of privacy. DCS removed Child from the care and custody of the Parents.

[5] On July 6, 2016, DCS filed a petition alleging that Child was a child in need of services (CHINS) based on multiple instances of domestic violence between the Parents, the violation of the no contact order, and Father's comments that he was unable to care for Child and that he wished to harm himself. On July 11, 2016, Father was charged with Level 6 intimidation after he threatened to kill a woman.[1] On August 24, 2016, the trial court found Child to be a CHINS.

[6] On September 27, 2016, the trial court entered a dispositional decree ordering Parents to, among other things: (1) complete a parenting assessment and comply with any recommendations; (2) complete a substance abuse assessment and comply with any recommendations; (3) participate with random drug and alcohol screens; (4) meet with medical/psychiatric personnel and comply with medications; (5) refrain from domestic violence; and (6) attend all visitations.

[7] Father participated with homebased case management.[2] There were three goals for his participation: (1) learn to provide adequate care to and supervision of Child; (2) complete all assessments and evaluations recommended by DCS; and

---

[1] The female victim and Mother share the same first name but it is unclear from the record whether the victim was, in fact, Mother.

[2] Father had been participating with homebased case management even before the CHINS petition was filed. He remained with the same case manager until he was unsuccessfully discharged in September 2016.

(3) display a drug and alcohol-free lifestyle. Father did not make progress in any of these three areas. During sessions, he bragged about alcohol and marijuana use and stated that he planned to voluntarily terminate his parental rights. His case manager also supervised his visits, of which he had three per week; he attended less than half. He was ultimately unsuccessfully discharged from this service because of noncompliance.

[8] Mother completed a substance abuse assessment, which recommended therapy because she had other underlying issues aside from substance abuse. She did not comply with therapy.

[9] In September 2016, both parents were referred to a new service provider for homebased case management and supervised visitation. The visitation supervisor was concerned that the Parents did not understand basic child development because of their unrealistic expectations during visits. Parents only attended their appointments and visits sporadically. Between October 2016 and June 2017, the Parents cancelled or failed to show at approximately 124 visits. At the time of the termination hearing in June 2017, Mother had been attending visits regularly for the past thirty days but Father had not seen Child since March 2017.

[10] Both parents have mental health issues. Father testified that he has been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, and "something to do with like, my mood changes." Tr. p. 101. He admitted that he is supposed to be taking medication but does not take it. Father did not

participate with recommended mental health treatment during the CHINS case. Mother has also been prescribed medication for mental health needs but does not take it.

[11] Mother was referred for a parenting assessment. It took four months to get Mother to attend the first of three appointments to complete the assessment. The results of the assessment indicated a high risk of child abuse, low parenting awareness skills, and low results regarding communication, involvement, and autonomy. Mother's score on the Parenting Stress Index was so significant that the test and the assessor concluded that "'we need rapid intervention, we need intensive therapy, we need supervision of that parent-child relationship.'" *Id.* at 42. The assessor concluded that Child needs to be protected from Mother and recommended that Mother participate in case management, mental health treatment, psychiatric treatment, and substance abuse treatment. The assessor believed, however, that there was a low probability of success because "there's a combination of personality disorder issues and cognitive issues that make it very difficult for there to be a change or an ability to change." *Id.* at 46-47. Father was also referred to a parenting assessment but failed to complete it.

[12] During the underlying CHINS case, Parents repeatedly engaged in criminal behavior that resulted in them being incarcerated:

- On July 5, 2016, Mother was charged with Class A misdemeanor invasion of privacy; she later pleaded guilty.
- On July 11, 2016, Father was charged with Level 6 felony intimidation; he later pleaded guilty.

- On November 6, 2016, Mother was charged with Class B misdemeanor false informing; she later pleaded guilty.
- On November 6, 2016, Father was charged with Class B misdemeanor false informing; this charge was later dismissed.
- On November 24, 2016, Father was charged with Class C misdemeanor operating a motor vehicle without ever receiving a license; he later pleaded guilty.
- On December 16, 2016, Father was charged with Level 6 felony auto theft; he later pleaded guilty.
- On April 29, 2017, Father was charged with Class B misdemeanor disorderly conduct; this charge had not yet been resolved at the time of the termination hearing.

In part because of their frequent incarcerations, the Parents were unable to maintain stable housing. They lived at approximately five different places and had periods of homelessness during the underlying CHINS case. At the time of the termination hearing, Mother was living in her own apartment and had been there for several months. At that time, she and Father were no longer together and she stated that he would not be allowed to move in with her when he was released from incarceration.

[13] Child has been placed in the same foster home since his removal and is doing well in that placement. He is not bonded to either of his parents. DCS and Child's guardian ad litem (GAL) believe that termination is in Child's best interests.

[14] On March 29, 2017, DCS filed a petition to terminate the parent-child relationship between Parents and Child. The termination hearing took place on

June 27, 2017, and on October 5, 2017, the trial court issued its order terminating the relationship. The Parents now appeal.

# Discussion and Decision

## I. Standard of Review

Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

> (A) that one (1) of the following is true:

(i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

# II. Child's Well-Being

[17] The Parents' sole argument on appeal is that the trial court erred by determining that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.[3]

# A. Findings of Fact

[18] In making this argument, they also challenge several of the trial court's findings of fact. We will consider each in turn. First, the trial court found that "Mother states she never completed therapy as recommend by [the substance abuse assessor] and as required by this court and [DCS]." Appealed Order p. 3. The Parents insist that the record shows that Mother requested mental health therapy on her own. But the record also shows that therapy was recommended following her substance abuse assessment, that she was required to comply with that recommendation, that she admitted she only went to therapy "a couple of

---

[3] This element of the statute and the element related to the reasons for removal are phrased in the disjunctive, but the trial court did not make a finding with respect to the likelihood of the remedy of the reasons for Child's removal.

times," and that she admitted that she failed to comply with "[t]herapy or something." Tr. p. 114-15, 118. We find the evidence supports this finding.

[19] Next, the Parents take issue with the trial court's finding that Father testified that he "has previously been diagnosed with Bipolar Disorder, Attention Deficit Hyperactive [sic] Disorder and Mood Disorder." Appealed Order p. 3. They insist that Father did not testify that he had been diagnosed with a mood disorder. While it is true that Father did not specifically testify that he had a mood disorder, he did testify that he was diagnosed with "something to do with like, my mood changes." Tr. p. 101. It was reasonable for the trial court to infer that Father meant that he had been diagnosed with a mood disorder. And in any event, Father concedes that he testified as to diagnoses of bipolar disorder and attention deficit hyperactivity disorder, meaning that the inclusion or exclusion of a mood disorder would not affect the trial court's ultimate conclusions regarding Father's mental health.

[20] Next, the Parents direct our attention to findings 49 through 52:

> 49. [Family Case Manager (FCM)] Reeser witnessed the parents['] unwillingness to accept advice from other[s] on parenting and the volatile reactions of Father when questioned about his plans for the future.

> 50. Father told FCM on one occasion that where he saw himself a year down the road was none of the FCM[']s business.

51.    When reunification is a priority, parents should be willing and able to voice their plans for the future, especially those plans that will have a direct impact on their ability to provide for their child.

52.    Father[']s unwillingness to speak about the future shows the inability of Father to comprehend the responsibility inherent in being a parent.

Appealed Order p. 5. The Parents insist that Father has "some mental health and cogitative [sic] disabilities" and that these disabilities "resulted in Father having difficulty processing and answering generic questions posed to him by a DCS caseworker." Appellants' Br. p. 16. This argument is merely a request that we reweigh evidence and second-guess the trial court's assessment of the credibility of various witnesses, which we may not and will not do. The record supports these findings.

[21]    Finally, the Parents quarrel with the trial court's finding that "[t]here have been no efforts, by either parent, to make themselves available on a consistent basis for visits with the infant child or to place themselves in a position to provide care to this little boy on a full time basis." Appealed Order p. 6. The Parents argue that, although Father was incarcerated in the months leading up to the termination hearing, Mother had been visiting regularly in the previous thirty days and, as such, had made efforts to reunify. The trial court, however, is entitled to disregard changes in a parent's behavior made only shortly prior to the termination hearing, weighing the parent's habitual pattern of conduct throughout the case more heavily. *K.T.K.*, 989 N.E.2d at 1234. Here,

throughout the entire case until the thirty days before the termination hearing, the attendance of both Parents at visitation was wildly inconsistent. Therefore, this finding is supported by the evidence in the record.

## B. Threat to Child's Well-Being

[22] The Parents' sole focus in making this argument is that there was not "clear and convincing evidence that Parents posed a menace to do bodily harm" to Child. Appellants' Br. p. 18. It is well established, however, that neither actual physical abuse nor a physical threat to a child is required to find that continuation of the parent-child relationship poses a threat to the child's well-being. *In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005). Indeed, the trial court "need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Instead, when the emotional and/or physical development of a CHINS is threatened, termination is appropriate. *Id.*

[23] Here, the Parents were in and out of jail multiple times during the CHINS case, resulting in unstable housing and inconsistent participation with services and visits. They missed approximately 124 visits with Child over the life of the CHINS case, resulting in a lack of a bond. The results of Mother's parenting assessment were so concerning that the assessor determined that Mother was "at the highest risk of abuse," tr. p. 39, that Child needed to be protected from Mother, and that Mother needed rapid intervention and intensive therapy.

Indeed, more than one service provider recommended therapy for Mother, but she never participated with that service. Both Parents have untreated mental health needs and neither is taking prescribed medication for their respective mental health diagnoses. We find that this evidence supports the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to Child's well-being.

[24] The judgment of the trial court is affirmed.

Kirsch, J., and Bradford, J., concur.