## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 22 2020, 10:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Nancy A. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of N.C., M.C., E.V., & S.V. (Minor Children):

A.V. (Mother of N.C., M.C., E.V., and S.V.),

and

J.V. (Father of E.V. and S.V.),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

April 22, 2020

Court of Appeals Case No. 19A-JT-2257

Appeal from the Elkhart Circuit Court

The Honorable Michael A. Christofeno, Judge
The Honorable Deborah A. Domine, Magistrate

Trial Court Cause Nos.
20C01-1905-JT-54
20C01-1905-JT-55
20C01-1905-JT-56
20C01-1905-JT-57

**Baker, Judge.**

[1] A.V. (Mother) and J.V. (Father) appeal the trial court's order terminating their parent-child relationships with their children. The parents argue that there is insufficient evidence supporting the termination order. Finding the evidence sufficient, we affirm.

# Facts

[2] Mother's four children at issue in this appeal are N.C. (born in July 2011), M.C. (born in August 2013), E.V. (born in September 2015), and S.V. (born in April 2017). Father's two children are E.V. and S.V.[1] In 2015, the two older children were found to be children in need of services (CHINS) based on poor home conditions. That CHINS case was closed with the children left in the home.

[3] In March 2017, the Department of Child Services (DCS) received a report alleging that the family's home had unsanitary conditions, the children in the home were dirty and smelled of urine, N.C. had a surgical incision that was infected and oozing pus, and the parents locked one-year-old E.V. in her room at night. On March 21, 2017, DCS filed a petition alleging that N.C., M.C., and E.V. were CHINS; at that time, the children remained in their parents' care and custody. On April 27, 2017, the trial court found the three children to be

---

[1] N.C.'s father is deceased and M.C.'s father did not appeal the termination order. Mother and Father have another child, who was born in November 2018 and who is also removed from their care, but that child is not part of the termination proceedings at issue herein.

CHINS based on the parents' admission regarding the poor condition of the home. At the May 18, 2017, dispositional hearing, the trial court ordered the parents to, among other things, complete parenting and mental health assessments, participate in homemaker/homebuilder services, participate in family/couple's therapy, and comply with any recommendations stemming from those services.

[4] S.V. was born in April 2017. On July 13, 2017, DCS filed a petition alleging that S.V. was a CHINS, and the trial court later found S.V. to be a CHINS after Mother admitted that the family home remained dirty, the older children were CHINS, and she needed help to keep the house clean. The dispositional order in S.V.'s case required the parents' continued participation in the existing services.

[5] When DCS filed the CHINS petition related to S.V. in July 2017, it removed all four children from the home because the parents were unable to provide the children with a safe place to live even with services in place. Since that time, E.V. and S.V. have remained in foster care.

[6] On January 11, 2018, M.C. and N.C. were returned to the parents' care and custody, but were removed again in August 2018 because of the parents' continued inability to keep them safe and maintain a safe and appropriate home. Specifically, although the parents had intensive homebuilder services in place, four-year-old M.C. got out of the home by himself in the middle of the night and was found and returned by police on three different occasions.

Additionally, Mother admitted that she could not handle the children and the parents had failed to follow through with agreed-upon safety plans. Since August 2018, M.C. and N.C. have remained in foster care.

[7] The parents each completed two psychoparenting evaluations with Dr. Allen Wax. The first took place in August 2017 and the second took place in April 2019; the second assessment occurred so that Dr. Wax could evaluate whether the parents had made any progress after receiving services for nearly two years. In the second evaluation, Dr. Wax concluded that he would not recommend reunification at that time. Specifically, he made the following observations and conclusions:

- Parents are able to "follow black and white instructions when rules are set out in a concrete fashion, 'but when raising children, no one can anticipate every situation, and when faced with a new situation, the [parents] have a tendency to make the wrong decision.'" Appealed Order p. 14 (quoting Dr. Wax's report).
- Father blamed the children for the dirty home conditions resulting in their removal.
- The main obstacle faced by the parents "is that parents deny that there is a problem with their parenting, they minimize the problems preventing reunification, and blame everyone else for the conditions that lead [sic] to removal." *Id.* at 27.
- Dr. Wax concluded that "'things are probably as good as they are going to get.'" *Id.* at 30 (quoting Dr. Wax's report).

Dr. Wax noted that the parents have a low level of cognitive functioning, but cautioned that their cognitive abilities are "by no means a concrete indication to being able to parent. In and of itself, it doesn't preclude effective parenting." Tr. Vol. III p. 41.

[8] Over the course of the CHINS case, the parents participated in many services, but were unable to maintain any significant, sustained progress. They participated in weekly parenting education for eighteen months, but their home was always very cluttered and, at times, did not have heat or hot water. They participated in home-based case management but made "very minimal" progress in addressing the conditions of their home. *Id.* at 69. They would clean the home when the case manager was there to help, but when she returned a week later, any progress had been undone. Father believed that it was Mother's responsibility to clean and offered minimal help. The home-based case manager also worked on parenting skills with Mother (Father did not participate), but Mother required "a lot of coaching" during visits to implement what she had been taught. *Id.* at 73. The home-based case manager testified that the parents were unwilling to accept responsibility for the situation leading to DCS's involvement with the family.

[9] The parents also participated with individual therapy in their home for eighteen months. The therapist testified that despite her help, parents were unable to handle the children or maintain a clean home. They also failed to follow through on safety plans that were put in place to (1) protect M.C. from N.C., who was older and physically abused M.C.; and (2) keep four-year-old M.C., who repeatedly left home in the middle of the night, inside the home. One of the reasons the therapist stopped working with the parents was that they were in a constant state of crisis with their housing and basic needs, but therapy would not be effective until they were able to admit some fault and find a willingness

to change their lives and their actions. The therapist was willing to work with the parents again if they were able to "maintain stability and accept responsibility for their involvement" with DCS, but they never achieved those goals. *Id.* at 55.

[10] Over the course of the CHINS case, the parents lived in five different homes. They continued to struggle financially and failed to follow through with budgeting. They consistently struggled to maintain the cleanliness of their homes even though they had charts instructing them on how to clean; for example, the homes often had clutter, trash on the floor, partially eaten food, flies, stacks of dishes, and dirty clothes. At times, the homes had dog accidents, mouse droppings, and broken glass laying around. The parents usually tried to clean before court hearings or child and family team meetings, but in between such events the home remained in unsanitary condition.

[11] E.V. and S.V. have remained in the same preadoptive foster home since July 2017. M.C. is in a separate preadoptive foster home. N.C. is also in a foster home; before he was placed there, he was in residential care for several weeks because he had been acting out aggressively in his previous foster home. N.C., M.C., and E.V. all have significant speech issues. M.C. has been diagnosed with attention deficit hyperactivity disorder (ADHD) and adjustment disorder. N.C. has been diagnosed with ADHD, post-traumatic stress disorder, and an unspecified conduct disorder. With therapy, M.C. has improved dramatically—he no longer hoards food, he has gained weight, maintains appropriate hygiene, and no longer tries to leave home by himself.

[12]     On May 16, 2019, DCS filed petitions to terminate the parent-child relationships between the parents and children. A factfinding hearing occurred on August 30, 2019. At the hearing, the DCS Family Case Manager (FCM) and the children's court appointed special advocate (CASA) each testified that in their opinion, termination was in the children's best interests. The FCM called the case a "rollercoaster," tr. vol. III p. 142, and noted that the parents were unable to handle the children, struggled with their roles as parents, and were not in a position to be able to meet the needs of any of the children, but especially the mental health needs of M.C. and N.C. The CASA testified that despite all the services offered, the parents had not been able to achieve sustained, significant progress. She explained that "[i]t's more than a messy house, it's something that is engrained in their lifestyle that it's—it's more—just that they—they do not know what basic needs are. They do not know what hygiene is, they do not know what education is, um, how to advance their children in their lives." *Id.* at 164. On September 5, 2019, the trial court issued an order terminating the relationships between the parents and the children. The parents now appeal.

# Discussion and Decision

[13]     The parents argue that there is insufficient evidence supporting the trial court's conclusions that (1) there is a reasonable probability that the conditions resulting in the children's removal will not be remedied; and (2) termination is in the children's best interests.

# I. Standard of Review

Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and whether the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005) (internal quotations omitted).

Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

> (A)  that one (1) of the following is true:
>
>> (i)  The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii)     A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)    that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

## II. Remedy of Conditions Resulting in Removal

First, the parents argue that the trial court erred by concluding that there is a reasonable probability that the reasons resulting in the children's original and continued removal will not be remedied.

All four children were originally removed from the parents' care and custody in July 2017 because even with intensive in-home services, the parents were unable to provide the children with a safe place to live. E.V. and S.V. have never returned to their parents' care. N.C. and M.C. did return home for eight months in 2018, but they were again removed for the same reasons that resulted in the initial removal and because four-year-old M.C. repeatedly left the home at night and had to be returned by police.

Over the course of the CHINS case, the parents received intensive home-based services for nearly two years.[2] They largely participated with those services. But despite all the effort made by service providers, the parents failed to achieve any significant, sustained progress on any of their issues. At the time of the termination factfinding hearing, they still struggled to maintain a clean, sanitary

---

[2] In addition to their lack of sustained improvement in this case, we also note that the family received services in the past when the older two children were found to be CHINS. That CHINS case was based on essentially the same issues that resulted in the instant CHINS case.

home for sustained periods of time. They showed no real improvement in their ability to parent all four children, especially the two older children with significant emotional needs. And a recurring theme from DCS, the CASA, and the service providers was the parents' refusal to accept any responsibility for their situation. They continued to shift blame to others—including the children—rather than accept their own role in their circumstances, and they minimized the significance of their issues. Their continued refusal to accept responsibility will always hinder their ability to make genuine progress.

[19] Dr. Wax, who evaluated the parents at the outset of services and then nearly two years later, found that they had made little to no progress during that time. At the time of the second evaluation, he did not recommend reunification between the parents and children despite all the services they had received.[3]

[20] The parents argue that they had shown some small improvements in the weeks leading up to the factfinding hearing.[4] But as noted above, throughout the case, they were able to show limited progress for periods of time, but the situation

---

[3] The parents point out that DCS did not provide them with a service recommended by Dr. Wax. Specifically, he suggested a need for a "super mentor," who would have provided even more intensive in-home services for the family. Appealed Order p. 32. The FCM testified, however, that such a service does not exist. *Id.* Furthermore, DCS is not required to show that it provided particular types of services to a parent as part of termination proceedings. *In re J.W., Jr.*, 27 N.E.3d 1185, 1190 (Ind. Ct. App. 2015). And as noted above, DCS provided extensive services to the parents, including psychoparenting assessments, multiple therapists and home-based case managers, and intensive homebuilders services. Therefore, the fact that DCS did not provide them with a "super mentor" does not require a reversal.

[4] We question the accuracy of this statement. About a month before the factfinding hearing, "the house was not in very good shape" and had "a lot of clutter," broken glass, mouse droppings, and dead bugs. Tr. Vol. III p. 93-94.

inevitably deteriorated. *See In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005) (holding that "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve"). Despite years of help, the parents are unable to maintain a safe, stable, and secure home that is suitable for the children. We can only find that the trial court did not err by concluding that there is a reasonable probability that the conditions resulting in the children's original and continued removal will not be remedied.[5]

# III. Best Interests

[21] Finally, the parents argue that the trial court erred by concluding that termination is in the children's best interests. Where, as here, the FCM and the CASA recommend termination and the trial court has found that the conditions resulting in removal will not be remedied, there is clear and convincing evidence that termination is in the best interests of the children. *In re A.D.S.*, 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013).

[22] The parents are unable to maintain a clean and safe home. They are unable to handle all four children and are unable to meet the significant needs of the two

---

[5] The parents also argue that the trial court erred by finding that there was a reasonable probability that continuation of the parent-child relationship posed a threat to the children's well-being. We need not consider this argument because the statute is phrased in the disjunctive and we have found the former element satisfied. We note, however, that based on this record we find no error with respect to this element either.

older children. While out of their parents' care, the children have done well. M.C., in particular, has made significant progress on the many serious issues he faces. But M.C. and N.C. will continue to need significant help to meet their emotional and behavioral needs, and the parents are unable to provide that support. The parents are either unable or unwilling to accept any responsibility for the family's situation and are likewise unable or unwilling to acknowledge how serious the issues are. All service providers for both the parents and the children, together with the FCM and CASA, testified that they believed that termination was in the children's best interests.

[23] Under these circumstances, we can only find that the trial court did not err by concluding that termination is in the children's best interests.

[24] The judgment of the trial court is affirmed.

Bradford, C.J., and Pyle, J., concur.